David S. TUCKER, and all employees of
the Defendants who are similarly
situated, Plaintiffs,

v.

LABOR LEASING, INC., etc.,
et al., Defendants.

No. 93–1259–Civ–J–10.

United States District Court,
M.D. Florida,
Jacksonville Division.

Sept. 21, 1994.

See also 155 F.R.D. 687.

Arthur George Sartorius, III, W. Kelsea Wilber, Sartorius & Wilber, P.A., Jacksonville, FL, for plaintiffs.

Peter Reed Corbin, Richard Neal Margulies, Corbin, Dickinson, Duvall & Margulies, Jacksonville, FL, for defendants.

### ORDER

SCHLESINGER, District Judge.

Before this Court are Plaintiffs' Motion to Approve Notice to Potential Class Members (Doc. 12) and Defendants' Motion for Sanctions (Doc. 19). The motion was considered by the United States Magistrate Judge pursuant to this Court's order of February 9, 1994, (Doc. 24), who has filed his report recommending that the Motion to Approve Notice to Potential Class Members be GRANTED, but limit notice to clerical employees from Defendant Gator's Jacksonville terminal, and direct the parties to meet and agree on a form of notice. Further, the Magistrate Judge recommended that the Motion for Sanctions be DENIED.

Accordingly, upon this Court's independent examination of the file and upon due consideration of the Magistrate Judge's report and recommendation, the report and recommendation is ADOPTED and confirmed and made a part hereof.

IT IS SO ORDERED.

DONE AND ORDERED.

### REPORT & RECOMMENDATION [1]

SNYDER, United States Magistrate Judge.

This cause is before the Court on Plaintiffs' Motion to Approve Notice to Potential

---

1. Specific, written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document. Failure to file timely objections shall bar the party from a de novo

Class Members (Doc. # 12; hereinafter Plaintiffs' Motion), filed on January 10, 1994, and Defendants' Motion for Sanctions (Doc. # 19; hereinafter Defendants' Motion), filed on February 7, 1994. An evidentiary hearing was held on July 15, 1994.

### Background

This action was filed in the Circuit Court of Duval County in the name of David S. Tucker and all employees of the Defendants similarly situated. Complaint (Doc. # 2), filed on September 2, 1993, at 1. Plaintiffs allege violations of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* (hereinafter FLSA), specifically asserting each of the Defendants employed him and others similarly situated for periods longer than forty hours per week without paying them at a rate of at least one and one-half times their regular pay rate, contrary to the requirements of 29 U.S.C. § 207. Complaint at Para. 1. Plaintiffs contend those similarly situated "were or are employed as raters, billing clerks, non-management office staff, or other employees who were or are not exempt from the provisions of the Act and have not yet learned of the unlawful conduct of the Defendants...." *Id.* at Para. 3.

On September 2, 1993, Defendants removed the case to this Court. Notice of Removal (Doc. # 1), filed on September 2, 1993. Plaintiff Tucker has since settled his individual claim with the Defendants. *See* Stipulation of Dismissal With Prejudice of Plaintiff Tucker's Individual Claims (Doc. # 26), filed on February 16, 1994. However, two former employees of the Defendants have consented to join the action in both an individual and representative capacity.

Plaintiffs seek Court approval for notification of this lawsuit to be provided to other employees of the Defendants, so they might opt-in to the matter if they desire. Post Hearing Memorandum in Support of Motion to Approve Notice to Potential Class Members and in Opposition to Motion for Sanctions (Doc. # 69; hereinafter Plaintiffs' Post-

Hearing Memorandum), filed on July 27, 1994, at unnumbered 1. *See also* Memorandum in Support of Motion to Approve Notice to Potential Class Members (Doc. # 13; hereinafter Plaintiffs' Memorandum), filed on January 10, 1994, at unnumbered 2. Defendants argue the standard to establish class notification has not been met. Defendants' Memorandum of Authorities in Light of Evidentiary Hearing (Doc. # 68; hereinafter Defendants' Post–Hearing Memorandum), filed on July 27, 1994, at 1–2.

Additionally, Defendants allege improper conduct by Plaintiffs; specifically, it is contended Plaintiffs sought unauthorized contact with employees of Defendants for the purpose of informing them of the lawsuit and persuading them to opt-in. Memorandum in Support of Defendants' Motion for Sanctions (Doc. # 20), filed on February 7, 1994, at 4–5. Plaintiffs assert any such communications were not designed to induce the recipients to join the lawsuit. Memorandum in Opposition to Defendants' Motion for Sanctions (Doc. # 27; hereinafter Plaintiffs' Memorandum II), filed on February 25, 1994, at unnumbered 2–3.

### Evidence and Testimony

*Testimony of Rebecca Sue Tucker*

Rebecca Sue Tucker was employed as a terminal rate clerk at the Gator Freightways terminal in Jacksonville between March 1990, and March 1993. She is the wife of David S. Tucker, who was also employed at the Gator terminal for a brief period. Her employer was actually Defendant Labor Leasing, as this entity issued her paycheck. At a later date, her paycheck was issued by Regal Express.

As a rate clerk, her responsibilities were to put charges on bills brought in by drivers, and to provide rate quotes. This was a clerical position; other clerical positions at the Gator terminal included cashiers, receptionists, OS & D clerks [2], and customer service. Rate clerks were expected to work ten

---

determination by a district judge and from attacking factual findings on appeal.

**2.** "OS & D" refers to over, short or damaged. OS & D clerks make special arrangements when a shipment is over, short or damaged.

hours per day, and she worked five days per week. She worked more than forty (40) hours every week, as did her husband, who was the day shift rate clerk. Because she spoke with them over the telephone, she knew rate clerks in other Gator, Greenwood and R & L terminals worked more than forty (40) hours per week also. She also spoke with several billers in the Wilmington terminal who claimed to have worked over forty (40) hours per week. Several employees from other terminals complained to her about not being paid overtime wages. These individuals were Lou Pati from Miami, Jack Borders from Lakeland, and Mike Melvin and Rob Schlake from Wilmington.

Ms. Tucker did not work much with the OS & D personnel, but did interact with the billing clerk at Jacksonville and those at other terminals. She would fax bills to the R & L billing clerk in Wilmington on occasion.

When Ms. Tucker was hired, she received an employee handbook from Labor Leasing (Plaintiffs' Exhibit 1). During her employment at the Gator terminal, she did not receive another handbook. She was told by Larry Roberts, Sr., the President and CEO of R & L, to inform customers Gator, R & L Transfer, Labor Leasing and Regal Express were all one company. Her work would benefit Defendant R & L Transfer when she would rate a shipment picked up in Jacksonville going to Wilmington, Michigan, West Virginia or Pennsylvania. She would rate the shipment and R & L would deliver it. Her work also benefited Gator Freightways in the same manner when one of the Gator terminals would deliver the shipment.

*Testimony of Vera N. Jeffries*

Vera N. Jeffries was employed at the Jacksonville terminal for about twenty (20) years. From 1990 until February 1991, she was employed by Gator Freightways in the OS & D department. At this position, she would find places for freight which was "checking over," and determine where the freight belonged. Damaged freight was put into an area known as the salvage hole, shrink-wrapped, and sent to the salvage department in the R & L Transfer terminal in Wilmington. Ms. Jeffries used the computer system at the Jacksonville terminal for the OS & D, claims and salvage business.

As an OS & D clerk, Ms. Jeffries communicated with all the Florida terminals, in addition to the terminal in Atlanta. She also dealt with the head of claims in the Wilmington terminal, who served as her supervisor. Her primary dealings with the Wilmington terminal were with an individual in the Claims Department, and she spoke with this person on a daily basis. Her paychecks were issued only by Labor Leasing after 1990, and she had nothing to do with any companies other than R & L and Labor Leasing.

After 1990, Ms. Jeffries worked more than fifty (50) hours per week. Her last pay stubs from Gator (Plaintiffs' Exhibit 2) indicate she worked forty (40) hours per week. During this time, she does not recall how many hours she worked, but the standard was to work fifty (50) hours per week, even though the time card indicated otherwise. In addition to her salary, she received health insurance from either R & L or Labor Leasing. She had health insurance from the "old Gator," but it was switched to R & L.

Ms. Jeffries first inquired into joining this lawsuit in the summer of 1993, and consulted Plaintiffs' law firm prior to August, 1993. She spoke with several people, including Mrs. Tucker, about the lawsuit, in the summer of 1993.

*Testimony of David S. Tucker*

David S. Tucker was employed as a rate clerk at the Gator terminal in Jacksonville from December 1990 until March 1992. He did not work for Gator at any other terminal. At this position, he quoted rates to customers, rated bills as they came in, and performed some tariff research. His paycheck was issued by Labor Leasing for part of his employment, and afterwards was issued by Regal Express. His work would benefit R & L if a shipment was from the Jacksonville terminal area to an R & L service area. Except for occasions when he had sick days, he did not work less than fifty (50) hours per week. His salary amount was supposedly based on a fifty (50) hour week, but he was not paid additional wages if he worked more than fifty hours.

In his work at Gator, he discussed rate applications for particular shipments with rate clerks from terminals in West Palm Beach, Miami, Tampa, Orlando, Tallahassee, and Pensacola in Florida; Savannah, Tifton and Atlanta in Georgia; Wilmington and Findlay in Ohio; and Detroit, Michigan. The terminals located in Florida and Georgia were designated Gator Freightways terminals, and those in Ohio and Michigan were designated R & L terminals.

In speaking with rate clerks from other terminals, he heard comments referring to people working long hours. One person he spoke to from the Wilmington terminal was named Mike Melvin. He also spoke to an individual from the Tampa terminal named Jack Borders. Mr. Tucker thinks he was fired from his job at Gator Freightways after injuring his back and being ordered by his doctor not to work. He was told by the Jacksonville terminal manager not to come back to his job.

### Testimony of Carolyn Mintz

Carolyn Mintz has been employed at Gator Freightways for about five (5) years. Her current position is office manager and she works OS & D customer service. She knows Mrs. Tucker, as they worked together for about three (3) years. One day in December 1993, after 5:30 p.m., she received a telephone call from Mrs. Tucker. Mrs. Tucker did not ask to speak with anyone, and they began a conversation. During this conversation, Ms. Mintz was informed of a class action lawsuit against Gator Freightways, and was given the name and phone number of an attorney to call if she wanted to join the action. She was also told it would not cost her anything, and she would receive a sum of money in January and would not lose her job. Mrs. Tucker indicated she was calling, and intended to call, other people about the case. Prior to this conversation, Ms. Mintz did not know of the lawsuit.

Ms. Mintz did not normally work at the time of day during which the phone call from Mrs. Tucker was received. Ms. Mintz is the only individual Mrs. Tucker spoke with at that time. She had discussed overtime wages with Mrs. Tucker when they were working together. During the phone conversation, Mrs. Tucker did not name the individuals she was contacting, and other than herself, Ms. Mintz does not know of Mrs. Tucker speaking with anyone about the lawsuit.

### Testimony of Thomas Cavellier

According to Thomas Cavellier, the Vice President of Finance for R & L Transfer, Gator Freightways, and Greenwood Motor Lines, the administrative headquarters of R & L Transfer are located in Wilmington, Ohio. R & L has terminal facilities in other locations. The typical clerical functions performed at R & L terminals are creating bills, rating bills, OS & D, and handling the initial stages of damaged freight claims. Some of the terminals have receptionists, and some have switchboard operators. Billing clerks take information from the bill of lading and enter it into a computer. Rating clerks determine what the initial charges on the bill are going to be. OS & D clerks investigate what happened to damaged freight, and produce documents to support an overage, shortage, or damage to the freight.

Certain clerical positions at R & L's administrative headquarters are unique to the Wilmington facility, as they are not done at the terminal level. The Accounts Payable and Accounting Department personnel pay the company's bills. These individuals report to a department head in Wilmington. There are no such positions at the outlying Gator and R & L terminals. Human Resources has one clerk who reports to a department supervisor in Wilmington. This position is responsible for monitoring benefit programs, and is not performed at the terminals.

Clerical personnel also work in the Collections Department in Wilmington. Their responsibility is to contact overdue customers. This work is not performed at the outlying terminals, and these individuals report to a supervisor in Wilmington. This work is structured so some of these clerks perform work exclusively for Gator, and some perform work exclusively for R & L. The Payroll Department is similarly structured. Payroll clerks input hours from timecards into a computer, and report to a department

head in Wilmington. No payroll function is performed at the terminal facilities.

The Receivables Department in Wilmington also employs clerical workers, and is structured in a similar fashion as the Collections Department. These individuals receive and process incoming payments, and apply them against outstanding invoices. Their supervisor works in Wilmington. Monies are collected by the outlying terminals. A small amount of C.O.D. monies are collected and deposited locally, and each terminal has its own bank and bank account.

The Claims Department is also known as the OS & D department. There are five individuals in this department at the Wilmington facility. They report to the Supervisor of Claims in Wilmington. Their function is to receive information from local OS & D clerks, and conduct further investigations to determine responsibility, and handle the adjusting end of claims. This position differs from that of the OS & D clerk position at the outlying terminals, as the terminal position is only involved in the investigating area of the claim. There are no clerical workers at the outlying terminal facilities who perform the same function as the Claims Department personnel.

Customer Service employees handle customer complaints and questions. They might perform an investigative function when freight has not been delivered to a location within a particular time. These clerical employees report to a Department Supervisor in Wilmington. Mr. Cavellier is not aware of any such positions at Gator terminal facilities.

Rates Department clerical employees audit the rating work from the terminals to verify correctness and accuracy. These clerks report to a department head in Wilmington. This function is not performed by anyone at the terminal facilities. The clerical functions of the Safety, Telemarketing, Traffic Departments, and Administrative Clerical/Kodak/Docutech are performed solely in Wilmington.

Billing (or invoicing) clerks in Wilmington create invoices from documents produced by terminal billing clerks, and the invoices are sent to customers. The invoicing clerks report to Rob Schlake, a department head in Wilmington. No invoicing is performed at the terminal facilities.

R & L has a terminal facility in Wilmington. Wilmington pre-clerk, cashier and switchboard clerical personnel perform work similar to functions of individuals in the terminals. The pre-clerks and cashier personnel work in the terminal.

The pay rates and ranges of Wilmington clerical personnel are determined by several factors, first being the technicality of the job. Pay is also determined by the prevailing market and wages in the specific geographic area. This is also true for clerical positions at the outlying terminals. In Wilmington, the individual department heads make the decisions regarding initial and subsequent pay rates, as well as hiring and firing. Management individuals from Gator Freightways do not play any part in decisions regarding hiring, firing, or pay rates for administrative employees in Wilmington.

Interlining is a common practice in the trucking industry, and involves the use of other trucking companies by another to make it economically feasible to move freight into an otherwise unserved area of the country. When trucking companies interline, the revenue is generally divided among the carriers based upon miles. R & L and Gator interline freight, and they interline and divide revenue in the same manner as is utilized by the trucking industry.

Gator Freightways has its operational headquarters in Lakeland, Florida. Tom Roberts is Vice President of Operations for Gator, and has authority to sell damaged Gator freight. Linda Roberts is in charge of hiring decisions for Gator. Gator has not pledged any property as security for any debt of R & L Transfer.

Labor Leasing, Inc. was formed to save money by combining certain functions of Gator and R & L. One such function was the payroll. Labor Leasing employed individuals, and leased them to the two trucking companies. Labor Leasing would perform the payroll functions for the two companies. Mr. Cavellier was never employed by Labor

Leasing. Labor Leasing has since been dissolved as a corporation, and the payroll is now handled from the Payroll Department in Wilmington.

R & L and Gator hold themselves out to be one company under the banner R & L Carriers. They utilize the same employee handbook, although the Labor Leasing handbook is no longer used. Administrative functions were performed for Gator at the R & L administrative offices in Wilmington. Hiring and firing was not done at Wilmington. At one time, Gator employees were provided job training at Wilmington.

Other than Wilmington, R & L has terminals in Kentucky, Indiana and Michigan. Gator has terminals in Georgia, Tennessee, Alabama and Florida. All terminals have local billing, rating and OS & D clerks. These positions are all clerical.

All paychecks are issued out of Wilmington. Mr. Cavellier examined the paychecks of Vera Jeffries (Plaintiffs' Exhibit 2), and noticed they indicate forty (40) hours. If the employee worked more than forty (40) hours, it would not be routine for the paycheck to indicate forty (40) hours.

*Deposition Testimony of Michael C. Murray*

The deposition of Michael C. Murray, Esquire (Plaintiffs' Exhibit 3), was submitted into evidence. Mr. Murray is employed as Vice President, General Counsel, and Secretary, for R & L Transfer, Gator Freightways, Florida Transfer and Freight, Inc., and Greenwood Motor Lines, Inc. There have been administrative inquiries by the United States Department of Labor regarding overtime pay by Gator Freightways. There were six (6) inquiries in the past five years. All were overtime wage complaints, and one was via telephone.

Gator Freightways paid money to some individuals on these claims. The claims paid were done so with the company denying liability, and the company's position was that overtime pay was not owed. The earliest such claim he was aware of was in January 1992. Other than Rebecca Sue Tucker, he is not aware of anyone to whom Gator failed to pay overtime wages when due. He does not know whether Ms. Tucker was paid by Regal

Express or Labor Leasing; he viewed all Florida employees as Gator employees.

*Analysis*

### NOTIFICATION TO POTENTIAL CLASS MEMBERS

Pursuant to 29 U.S.C. § 216, Plaintiffs seek Court approval for notice of this lawsuit to be provided to all similarly situated employees of Defendants. Plaintiffs' Memorandum at unnumbered 2. Plaintiffs argue there are other similarly situated employees of Gator, R & L, Regal Express, and Labor Leasing who may desire to opt-in to this lawsuit. *Id.* at unnumbered 7. Defendants contend the requirements of *Dybach v. State of Fla. Dept. of Corrections,* 942 F.2d 1562 (11th Cir.1991), have not been met to show such similarly situated employees exist. Defendants' Post–Hearing Memorandum at 1–2.

■ Under § 216, the FLSA authorizes "collective action" on behalf of similarly situated persons. *Garner v. G.D. Searle Pharmaceuticals & Company,* 802 F.Supp. 418 (M.D.Ala.1991). The Eleventh Circuit has held a court may authorize notice of a suit brought pursuant to the FLSA if it finds there are other similarly situated employees who desire to opt-in to the lawsuit. *Dybach,* 942 F.2d at 1567.

■ When determining if persons are similarly situated under the FLSA, the Eleventh Circuit requires a determination the individuals "are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Id.* To be similarly situated, courts have held positions need not be identical, but similar. *Riojas v. Seal Produce, Inc.,* 82 F.R.D. 613, 616 (S.D.Tex.1979).

■ Plaintiffs have shown similarly situated individuals are working in clerical positions in the Gator terminal in Jacksonville who may desire to opt-in to this lawsuit. The present Plaintiffs in this lawsuit are Vera Jeffries, a former OS & D clerk, and Janice Sole, who claims she was "employed by the Defendants ... as either a rater, billing clerk, non-management office staff, or in another position which was not exempt [from] the overtime provisions of the

[FLSA]." Consent to Join Action (Doc. # 10; hereinafter Sole Consent), filed on December 20, 1993, at unnumbered 1. The clerical positions in the Jacksonville terminal, including those of cashier, receptionist, customer service, and the rating and billing clerks, performed job functions similar to those of an OS & D clerk.

Mrs. Tucker and Ms. Jeffries each claim to have worked more than forty (40) hours each week, and often more than fifty (50) hours. Ms. Jeffries stated she was only paid based upon a forty (40) hour week. Mrs. Tucker was informed she was expected to work fifty (50) hours per week. Ms. Sole alleges she was "employed in the enterprises of the Defendants for workweeks longer than 40 hours a week and was not paid wages at a rate of at least one and one-half times the regular rate at which employed." Sole Consent at unnumbered 1. David Tucker, a rate clerk, claimed to be paid a salary based on a fifty (50) hour week, and was not paid overtime wages if he worked more than fifty (50) hours.

Each of these individuals worked in a clerical position in the Jacksonville terminal. Testimony from Mr. Cavellier and Mr. Murray establishes the wage rates and shift decisions are determined on a terminal-by-terminal basis. The payroll determinations for Jacksonville clerical positions would have been made by the terminal manager. Thus, other clerical personnel in the Jacksonville terminal were likely paid in the same manner as Mrs. Tucker and Ms. Jeffries. Therefore, it is probable other clerical personnel in the Jacksonville terminal may desire to opt-in to the lawsuit.

■ However, Plaintiffs have failed to show the requirements of *Dybach* to be met for employees of Defendants working at other terminals. Rebecca Sue Tucker testified she heard complaints from other individuals working in three other terminals. However, she only indicated their names and their terminal locations; there was no evidence presented indicating the positions or responsibilities these individuals held at their respective terminals. David Tucker spoke with Mike Melvin and Jack Borders, but only made vague reference to comments about long hours being worked. Also, Plaintiffs proffer the names mentioned in Mr. Murray's deposition as similarly situated individuals who filed overtime claims through the United States Department of Labor. *See* Plaintiffs' Post–Hearing Memorandum at unnumbered 2. However, no evidence was offered regarding the duties these individuals performed at their respective terminals.[3] Nor was evidence presented as to their pay provisions. Because Plaintiffs have failed to provide any evidence with respect to the job requirements or pay provisions of the individuals named by Rebecca Sue Tucker and David Tucker, the Court cannot find they are similarly situated with the present Plaintiffs. That they may have worked in a Gator or R & L terminal does not alone meet the *Dybach* standard.

■ Likewise, evidence was presented showing clerical functions being performed in R & L's Wilmington administrative facility. Plaintiffs argue the individuals in such clerical positions are similarly situated, and thus should receive court-approved notification of the lawsuit. Plaintiffs' Post–Hearing Memorandum at unnumbered 4. While such positions may be similar to those of Plaintiffs in responsibilities and tasks performed, no evidence was presented to show the Wilmington clerical positions to be similarly situated with respect to pay provisions. Indeed, the testimony of Mr. Cavellier shows the pay provisions for the Wilmington facility were made by the individual department heads, whereas pay provisions for Plaintiffs were made by their terminal manager.[4] That they may be

3. The *Garner* court, while stating a strict standard of proof "would unnecessarily hinder the development of collective actions and would undermine the 'broad remedial goals' " of the Act, did require a higher threshold showing than was met by Plaintiffs in the present case. *Garner*, 802 F.Supp. at 422. In *Garner*, evidence was presented identifying 40 individuals, each of whom could make out a prima facie violation of the FLSA; this was deemed sufficient to indicate there were other employees similarly situated who might have decided to opt-in. *Id.*

4. Plaintiff cites for support *Church v. Consolidated Freightways, Inc.*, 137 F.R.D. 294 (N.D.Cal. 1991) in arguing "the fact that employees are

paid by the same entity does not entitle them to similarly situated status. Also, there has been no showing any Wilmington administrative clerical personnel may desire to opt-in to this lawsuit.

Plaintiffs presented considerable evidence regarding Defendants holding themselves out to the public as the same company. Also, it has been shown the Defendants shared, to some extent, administrative functions through the R & L facility in Wilmington. However, these facts alone are insufficient to show all terminal clerical employees to be similarly situated with Plaintiffs. With the exception of the Gator terminal in Jacksonville, Plaintiffs have failed to show clerical employees of Defendants to be similarly situated for the purposes of the FLSA.

However, evidence does show similarly situated employees, whom may desire to opt-in to the matter, working in the Jacksonville terminal. It is within the Court's power to limit notification to a particular geographic area. Therefore, the Court recommends notification be limited to the Jacksonville terminal of Defendant Gator Freightways. As to the form the aforementioned notification should take, the Court recommends the parties be directed to meet and arrive at a mutually agreeable format.

*SANCTIONS*

Defendants argue sanctions should be imposed against Plaintiffs, alleging Rebecca Sue Tucker "improperly solicited [Carolyn] Mintz' participation as a class member in the instant action." Defendants' Post–Hearing Memorandum at 7. *See* Affidavit of Carolyn Mintz, attached to Defendants' Motion. It is contended Mrs. Tucker improperly contacted a Gator employee, seeking the telephone number of another employee. Defendants' Motion at 5. *See* Affidavit of Joseph Richard

Justice, attached to Defendants' Motion. Defendants further allege Janice Sole improperly contacted Ms. Mintz regarding the lawsuit. Defendants' Motion at 5. *See* Affidavit of Carolyn Mintz, attached to Defendants' Motion. Defendants claim such conduct is in violation of Rule 4.04, Local Rules, United States District Court, Middle District of Florida (hereinafter Local Rule 4.04). Defendants' Motion at 7.

Local Rule 4.04(e) expressly forbids direct or indirect communication, by parties or their counsel, to solicit "actual or potential class members who are not formal parties to the case." However, Local Rule 4.04 is arguably not applicable in the present matter. First, Local Rule 4.04 is entitled "Class Actions," and all references therein are to Fed. R.Civ.P. 23. No mention is made to any other statute or rule, nor is reference made to any other type of representative lawsuit. In addition, Local Rule 4.04(e) specifically applies to "every case sought to be maintained by any party as a class action." Cases ruling in similar actions have held the collective action allowed under 29 U.S.C. § 216(b) is not a class action governed by Fed. R.Civ.P. 23. *See Vanskike v. Peters,* 974 F.2d 806, 812 (7th Cir.1992).

Additionally, the court in *Garner* specifically stated "[section] 216(b) does not require parties to obtain judicial approval before seeking to locate other 'similarly situated' persons ... it is not the court's role to prohibit plaintiffs from attempting to gather these consents." *Garner,* 802 F.Supp. at 421.[5] However, this Court's Order (Doc. # 38; hereinafter Order), entered April 15, 1994, attempted to reconcile the competing interests of *Dybach* and Local Rule 4.04(e) with respect to communications by Plaintiffs with potentially similarly situated persons,

located in differing geographic areas or held a variety of different jobs does not preclude notice." Plaintiffs' Post–Hearing Memorandum at unnumbered 5. However, in making this holding, the *Church* court cited specifically to supported allegations the decision making process by the defendant was highly centralized. *Id.* at 307. In *Church,* the court distinguished *Lusardi v. Xerox Corp.,* 118 F.R.D. 351 (D.N.J.1987), *vacated in part and modified in part on other grounds,* 122 F.R.D. 463 (D.N.J.1988), emphasizing the *Lusardi* court's reasoning in holding a

class not to be similarly situated because employment decisions were made "by different supervisors ... on a decentralized employee-by-employee basis." *Church,* 137 F.R.D. at 307, *citing Lusardi,* 118 F.R.D. at 352.

**5.** The *Garner* court distinguished this statement from situations in which judicial involvement in the notification process is sought. *Garner,* 802 F.Supp. at 421.

and ordered no communication be made without leave of the Court.

 Mrs. Tucker contacted Ms. Mintz in December, 1993, prior to Plaintiffs' Motion being filed. Such contact, as it was an attempt to obtain additional consents, was within the spirit of the provisions of Section 216(b) as stated by *Garner*. Additionally, the Court notes Mrs. Tucker is not a party to this action, as her claim against Defendants was settled.[6] *See* Defendants' Motion at 2. Because the communication occurred well in advance of the Order, Mrs. Tucker's contact with Ms. Mintz was not improper.

Mrs. Tucker's contact with Mr. Justice took place in December 1993, and was stated as an attempt to obtain a telephone number of another employee. Defendants' Motion at 5. However, Mrs. Tucker claimed to have needed this telephone number for personal business not connected with Gator employment. *See* Affidavit of Rebecca Sue Tucker, attached to Plaintiffs' Memorandum II. Again, the Court finds this contact was not improper, as Mrs. Tucker is not a party to this lawsuit, and the contact occurred prior to this Court's Order.

 Ms. Sole's contacts with Ms. Mintz took place in December 1993 and on January 20, 1994, well in advance of this Court's Order. *See* Affidavit of Carolyn Mintz, attached to Defendants' Motion. The December communication did not concern this lawsuit. While Ms. Sole was a party to this lawsuit at the time of the January 20 communication, the extent of the alleged discussion was to ask whether Ms. Mintz had "been contacted by anyone ... to 'pull' or collect timecard records," and to ask if Ms. Mintz knew of the lawsuit that had been filed. Defendants' Motion at 4–5.

While such contact is arguably violative of the provisions of Local Rule 4.04(e), the Court finds sanctions would not be proper under the circumstances. First, at the time the contact was made, the Court had yet to issue the Order placing restrictions on such communication. Additionally, prior to the Court's Order, such contact was likely proper under *Garner*. Therefore, the Court finds

6. Local Rule 4.04(e) prohibits contact of potential class members by parties or counsel.

Ms. Sole's communication with Ms. Mintz was not improper under the circumstances.

### RECOMMENDATION

Accordingly, it is recommended the Court enter an order **GRANTING** Plaintiffs' Motion to Approve Notice to Potential Class Members (Doc. # 12), limited to those clerical employees from Defendant Gator's Jacksonville terminal and directing the parties to meet and agree to a form of notice, otherwise **DENYING** it, and **DENYING** Defendants' Motion for Sanctions (Doc. # 19).

**ENTERED** at Jacksonville, Florida this 31st day of August, 1994.