Lennard A. **BROOKS**, and others similarly situated, Plaintiff,

v.

**BELLSOUTH TELECOMMUNICATIONS, INC.,** Defendant.

No. CV 94–B–1008–S.

United States District Court, N.D. Alabama, Southern Division.

Sept. 29, 1995.

---

3. The Court will consider a proper supplemental motion for fees should Plaintiff elect to file such a motion.

Judy Whalen Evans, Harris Evans Cleckler Berg & Rogers, P.C., Birmingham, AL, Richard R. Edwards, Smith Currie & Hancock, Atlanta, GA, Stephen J. Bumgarner, Olschner & Hart, Birmingham, AL, Jeffrey G. Casurella, Roy E. Barnes, Thomas E. Cauthorn, III, Howard D. Rothbloom, Cauthorn & Phillips, Marietta, GA, for plaintiff.

Harry L. Hopkins, Thomas F. Campbell, David L. Warren, Jr., Lange Simpson Robinson & Somerville, Birmingham, AL, for defendants.

LaVeeda Morgan Battle, Gorham & Waldrep, P.C., Birmingham, AL, for movant.

## MEMORANDUM OPINION

BLACKBURN, District Judge.

Currently before the court is the motion of the plaintiff, Lennard A. Brooks, for conditional class certification, for an order directing court authorized notice of this action be sent to prospective members of the forming class, and for an order directing defendant to provide the names and addresses of prospective class members. Upon consideration of the record, the submissions of the parties, the relevant law, and the argument of counsel, it is the court's opinion that the motion is due to be denied.

### Plaintiff's Allegations

This lawsuit arises out of plaintiff's termination from his employment with defendant, BellSouth Telecommunications, Inc., ("BST"), on July 23, 1993. As a result of his termination, plaintiff timely filed a charge of discrimination under the Age Discrimination in Employment Act of 1967, ("ADEA"), with the Equal Employment Opportunity Commission, ("EEOC"), on January 10, 1994. (Pl.Ex. A). Defendant filed a response with the EEOC on approximately March 8, 1994. (Pl.Ex. B at 3). In its response, defendant stated that plaintiff was terminated for failure to follow established procurement procedures and for gross mismanagement of company funds. *Id.* at 3. The EEOC issued a Notice of Right to Sue letter to plaintiff on April 7, 1994. (Pl.Ex. C at 1).

On June 24, 1994, plaintiff filed the instant complaint. In his complaint plaintiff alleges discrimination on the basis of age with regard to his own termination[1] and seeks to bring an action on behalf of other similarly situated plaintiffs. On August 31, 1994, the court entered an order directing that all discovery with regard to the class action allegations should be completed by November 30, 1994.

Plaintiff filed his motion for conditional class certification on January 19, 1995. He

1. Plaintiff also alleges a number of state law causes of action.

moves the court to enter an order provisionally certifying a class consisting of:

> All former management employees of any unit, division or subsidiary of BellSouth Telecommunication, Inc. or BellSouth Corporation who have been terminated or required to retire from employment in the period July 14, 1993 through September 1, 1994, who were forty (40) years of age or older at the time of their termination or retirement, and who contend that such termination or retirement was caused by age discrimination policies or practices of Bell-South Telecommunication, Inc. or Bell-South Corporation.

Plaintiff claims that documentary and statistical evidence indicates an "overarching" policy by BST of eliminating older employees. Plaintiff contends that defendant formulated and implemented a five-year operations plan which contained a policy of intentionally offering illegal early retirement incentives. (Complaint, ¶ 144 at 30–33). Plaintiff asserts: "In furtherance of their pattern and practice of intentional age discrimination, defendants encouraged early retirement through the use of IMAP,[2] VSIPP,[3] VEER[4] and CTAP[5] designed to reduce the number of BSC employees within the aging management force.... The various early retirement plans which were offered by [d]efendant[ ] to [its] employees combined with a pattern and practice of subtle and explicit threats which, among other things, consisted of announcements that: (I) Jobs were being eliminated; (ii) Pay-grades were being eliminated; (iii) Departments and/or divisions were being eliminated; (iv) Jobs were being relocated to other, less desirable locales; and (v) Certain employees were designated as—'Surplus' or 'Available for Reassignment....'" (Complaint, ¶ 144(f)–(g) at 32–33). Plaintiff did not accept either of the retirement plans offered to him, the V.E.E.R. '91 and the CTAP. He contends that as a result of rejecting defendant's early retirement of-

fers, he was otherwise terminated as were other employees of defendant.

Plaintiff contends that three documents, when considered together, indicate an overall policy and pattern of age discrimination. The first document is an outline of discussion topics for a meeting attended by representatives of the defendant in July of 1984. (Pl. Ex. J). Plaintiff highlights the following six topics contained in the document: (1) WORK FORCE—Mature—Move Out, (Pl.Ex. J at 6); (2) REWARD SYSTEMS—Makeup of Force is Different Now (Mature, . . .), (Pl. Ex. J at 8); (3) TECHNOLOGY "Outdated" Employees (Pl.Ex. J at 9); (4) WEAKNESSES—Aging Work Force (Pl.Ex. J at 15); (5) ENVIRONMENTAL IMPACTS—Work Force age (Pl.Ex. J at 3); (6) TARGETS, BENCHMARKS, CORNERSTONE STATEMENTS—Organizational Management that Motivates its Employees—Hire, Train, Management ... to Produce Cost Effective Network, (Pl.Ex. J at 11).

The second document is a 1991 article in *The Bama News* which plaintiff alleges is one of defendant's employee newspapers, and in which the following statements were made:

> However, an older work force may be less willing to adapt to changes or take the kinds of risks necessary for rapid financial growth. In addition, many baby boom-aged workers will find themselves "stuck" at the middle-manager level, competing with other members of their generation for scarce promotions.

(Pl.Ex. E at 2).

The third document is a report plaintiff asserts was prepared by Hewlett Packard for defendants in August of 1994. The report was apparently prepared to identify problems within BellSouth and offer solutions. One problem was identified as "Old mind set/unknown future; Theme: Culture Adverse to Risk Taking." One "solution" proposed by Hewlett Packard was "shoot everyone over 45." (Pl.Ex. F).

---

**2.** Involuntary Management Attrition Program. (Pl.Ex. I at 2).

**3.** Voluntary Separation Income Protection Plan. (Pl.Ex. I at 3).

**4.** Voluntary Enhanced Early Retirement.

**5.** Career Transition Assistance Program.

Plaintiff also submitted the affidavit of Furman Wallace, a former employee of defendant.[6] (Pl.Ex. I at 1). Mr. Wallace states in his affidavit that beginning in the mid–1980's, South Central Bell, BellSouth Telecommunications' predecessor, began strategic planning for the future. Mr. Wallace states that in 1984 South Central Bell held a meeting in Birmingham at which time the " 'aging work force' " was discussed and constantly referred to as a weakness. Mr. Wallace stated that he was a member of a committee organized to prepare minutes of the Birmingham meeting for distribution to all attendees of the meeting and managers at the pay grade six level and above in the five-state South Central Bell area. Further, Mr. Wallace states that

> [b]eginning with the meeting held in Birmingham in 1984 and continuing through [his] retirement in 1990, defendants have engaged in a pattern and practice of wilful [sic] and intentional age discrimination through the use of a "carrot and stick" artifice, designed to reduce the number of employees within the perceived aging management force. The "carrots" were the early retirement programs; the "sticks" were the announced reductions in force and the implicit threats of involuntary termination.

(Exhibit I, ¶ 8 at 3).

Plaintiff also asserts that statistical evidence supports his theory of "overarching" discrimination. Plaintiff references Pl.Ex. G which is a summary of all employees who either elected early retirement under one of two plans, CTAP–V and CTAP–I, or who were terminated during a one hundred eighty day period preceding January 11, 1994. Plaintiff contends that the fact that 94.4% of the management employees who left during that time frame were over 40 years of age supports an inference of discrimination and warrants conditional class certification and court-ordered notice.

**6.** In 1987 Mr. Wallace sued BellSouth, BellSouth Services, and South Central Bell alleging age discrimination.

**7.** According to defendant, in May, 1991, the Voluntary Enhanced Early Retirement Program

*Summary of Plaintiff's Employment with Defendant*

Plaintiff was employed by BST from September 21, 1970 through July 23, 1993. For the vast majority of the time that plaintiff was employed by BST, he worked and lived in the Atlanta, Georgia area. (Complaint, ¶ 26).

In June of 1991, plaintiff was informed that his position in Atlanta, Georgia was being transferred to Birmingham, Alabama. Plaintiff alleges that at this time defendant offered him a choice between a lateral transfer to Birmingham, Alabama and the Voluntary Enhanced Early Retirement Program 1991 (V.E.E.R. '91),[7] an early retirement package. Plaintiff rejected the retirement offer because he was not ready to retire. (Def.Ex. 1 at 191).

Plaintiff relocated to Birmingham. He contends that by December of 1991, his job functions were being eliminated and his responsibilities were divided among two younger employees in two different locations, Valleydale, Alabama and Stockbridge, Georgia. Plaintiff states that he asked to be considered for the job in the Stockbridge, Georgia location. He contends that he was not allowed to take the job in Stockbridge and the position was filled by a younger man with less experience.

In May 1992 plaintiff arranged for a lateral transfer to a different job within BST. In June of 1993, a meeting was held with all of the members of plaintiff's work group, consisting of 38 members, At this meeting, all member of "universe number WS–038" were offered an early retirement option known as the BellSouth Career Transition Assistance Plan (CTAP). The members were informed that their "universe" would be reduced by a quantity of one. No one from "universe WS–038" accepted the CTAP offered by defendant. On July 23, 1993, plaintiff was discharged for alleged failure to follow estab-

1991 (V.E.E.R. '91) was offered to those employees whose service and age exceeded sixty-five as of June 1, 1991. Election for this retirement plan had to be made between June 1 and July 31, 1991. (Pl.Ex. B at 5).

lished procurement procedures and gross mismanagement of funds.

## DISCUSSION

### Class Actions Within the Age Discrimination in Employment Act

 In most federal class actions, including those involving sex and racial discrimination, the issues of joinder and notice to potential class members are governed by FED.R.CIV.P. 23. Class actions under the ADEA do not however proceed under FED. R.CIV.P. 23. The ADEA explicitly incorporates section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b) which provides the procedures for representative or class actions:

> An action to recover the liability ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees **similarly situated.** No employee shall be a party plaintiff to any such action unless he gives his **consent in writing** to become such a party and such consent is filed in the court in which such action is brought. (emphasis added).

Under this section no person can become a party plaintiff to an ADEA action unless that person affirmatively "opts into" the class by giving written, filed consent.[8]

There is generally a two-step process for forming an ADEA representative action[9]. The first step is the so-called notice phase and it begins when a plaintiff seeks court authorization to issue notice of the lawsuit to other potential plaintiffs. The second step in the 216(b) representative process usually occurs after all persons have filed consents to opt into the lawsuit and discovery concerning the various allegations of the potential class

members has taken place. At that time, the court will generally determine whether the case should proceed as a collective action or be severed into separate lawsuits.

### Court-Authorized Notice

In *Dybach v. State of Florida Dep't of Corrections*, 942 F.2d 1562 (11th Cir.1991), the Eleventh Circuit considered the question of whether a district court has the authority under the FLSA to issue an order requiring notice to similarly situated persons. The court held that the broad remedial purposes of the FLSA are best served if the district court is found to have the authority and discretion to give notice to other potential class members to "opt in" to plaintiff's class. Before a district court should issue an order requiring notice to similarly situated employees, the court **"should satisfy itself** that **there are other employees** of the department-employer who desire to "opt-in" and **who are "similarly situated"** with respect to their job requirements and with regard to their pay provisions." *Dybach*, 942 F.2d at 1568–69. (Emphasis added). Although the *Dybach* case was brought directly under the Fair Labor Standards Act, the principles announced therein would apply to this case.

*Allegations That Putative Class Members Were Together the Victims of a Single Decision, Policy or Plan Infected by Discrimination*

 Despite extensive discovery on the class action issue, plaintiff has not put forth substantial evidence that the proposed class members were the victims of a single decision, policy, or plan infected by discrimination. Without engaging in a lengthy discussion on this point, the court notes the following:

1. Volunteer early retirement plans are not per se illegal under the ADEA.

---

8. The fundamental difference between § 216(b) and Rule 23 is that under § 216(b), members of the class must affirmatively "opt in," while in a Rule 23 proceeding, each person within the class description is presumed a member of the class and is therefore bound by the judgment unless the person "opts out" of the suit. *LaChapelle v. Owens–Illinois, Inc.*, 513 F.2d 286, 288 (5th Cir. 1975). However, in discussing the representa-

tive action in the context of ADEA cases, most courts utilize class action terminology from Rule 23 cases.

9. *See Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1213–1214 (5th Cir.1995) for discussion of competing methodologies in making an ADEA class certification decision.

2. Plaintiff's statistical showing does not, alone, or in conjunction with his other evidence support an inference of discrimination. In fact, the evidence offered by defendant reflects that from 1990 until 1993, the average age of the management work force increased from 42.78 years to 44.02 years. (*See* Def.'s Vol. II, Tab 13 at 2).

3. Plaintiff's three documents do not establish a single plan. Without going into extensive discussion, an examination of the documents on which plaintiff relies do not support his thesis. First, the 1984 document references a Network Operations five-year plan. Plaintiff never served in the Network Organization and there is no evidence that a five-year plan was ever adopted. The document is a decade old (and was over eight years old at the time of plaintiff's termination). Plaintiff offered no proof of any connection between the 1984 outline and the early retirement programs, or between the plan and the involuntary terminations of plaintiff and others. There was also no evidence that defendant implemented the early retirement plans by improperly coercing management employees to accept early retirement.

Next, *"The Bama News"* article discusses a study entitled "Workforce 2000" conducted by the Hudson Institute. A copy of "Workforce 2000" was introduced in evidence at the hearing on plaintiff's motion. This document addresses the changing work force and attempts to predict the makeup of the country's work force by the year 2000. Plaintiff's argument that the *Bama News* article is evidence of an overarching policy of discrimination is disingenuous.

Finally, plaintiff argues that defendant "adopted" the Hewlett Packard Report and in particular, its clearly tongue-in-cheek suggestion to "shoot everyone over 45." There is obviously no evidence that defendant ever adopted such a proposal. The report is a lengthy document filled with substantial technical advice. Indeed if the offensive comments had not been highlighted by plaintiff's counsel, it would have taken a great deal of time to locate them in the report.

In sum, plaintiff's reliance on the three documents is misplaced. The documents do not warrant a conclusion that defendant has engaged in a single plan or policy to illegally discriminate against its employees on the basis of age.

After reviewing all the evidence submitted by the plaintiff, the court finds that plaintiff has not demonstrated a sufficient factual basis on which a reasonable inference could be made that defendants orchestrated or implemented a single decision, policy, or plan to discriminate against their management employees on the basis of age. As noted by the court in *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266 (D.Minn.1991), "courts, as well as practicing attorneys, have a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." It is well known that BellSouth is downsizing its work force. Plaintiff states that defendant has announced that an additional 10,000 jobs will be eliminated. Plaintiff's efforts to send court authorized notices would undoubtedly "stir up" litigation. The court would have no problem with this concept if plaintiff had put forth evidence on which a reasonable inference could be made that BellSouth had implemented a discriminatory scheme to get rid of its older employees. Plaintiff has failed to put forth such evidence and he is therefore not entitled to have court authorized notice sent to potential opt-in plaintiffs.

### Similarly Situated Standard

Plaintiff may not maintain a representative action under § 216(b) unless all the employees represented are similarly situated. Plaintiff argues that at this stage of the proceeding he should not be required to make a showing of similarly situated plaintiffs. The court disagrees. In order to be entitled to conditional class certification plaintiff has to submit evidence establishing at least a colorable basis for his claim that a class of similarly situated plaintiffs exist. Plaintiff has not met his burden of demonstrating a reasonable basis for presuming that similarly situated, aggrieved individuals exist in the class of persons that he proposes for conditional class certification.

Neither the FLSA nor the ADEA defines the "similarly situated" standard. Some courts have given the words a broad inter-

pretation. *See Heagney v. European American Bank*, 122 F.R.D. 125 (E.D.N.Y.1988) (finding plaintiff's allegations sufficient to satisfy 'similarly situated' standard although workers may have left their jobs at different times via different procedural mechanisms. The court concluded that alleged unity of the discriminatory scheme overwhelmed the differences in the respective cases).

The Eleventh Circuit requires a determination that persons are similarly situated "with respect to their job requirements and with regard to their pay provisions" when deciding whether persons are similarly situated under the FLSA. *Dybach*, 942 F.2d at 1568; *Tucker v. Labor Leasing, Inc.*, 872 F.Supp. 941, 947 (M.D.Fla.1994) (citing *Riojas v. Seal Produce, Inc.*, 82 F.R.D. 613, 616 (S.D.Tex.1979)). Also, the Eleventh Circuit has held that "plaintiffs have the burden of demonstrating a reasonable basis for crediting their assertions that aggrieved individuals exist[ ] in the broad class that they propose[ ]." *Haynes v. Singer Co., Inc.*, 696 F.2d 884, 887 (11th Cir.1983).

This court agrees with the analysis of the similarly situated inquiry found in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 352 (D.N.J. 1987), *vacated in part and modified in part on other grounds by Lusardi v. Xerox Corp.*, 122 F.R.D. 463 (D.N.J.1988). The *Lusardi* court decertified a class of plaintiffs after finding that they were not similarly situated. The court noted that plaintiffs, even after extensive discovery, were unable to show any commonality beyond allegations of ADEA violations, their age group, and their status as former or present employees of the defendant. *Lusardi*, 118 F.R.D. at 359. The court stated that for various reasons including "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available ... which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) the apparent absence of filings required by the ADEA prior to instituting suit ..." the class should be decertified. *Id.*[10]

The Fifth Circuit, in *Mooney v. Aramco Services Co.*, 54 F.3d 1207 (5th Cir.1995) discussed the *Lusardi* decision:

> Under *Lusardi*, the trial court approaches the "similarly situated" inquiry via a two-step analysis. The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision—usually based only on the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members.
>
> Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.
>
> The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial.

*Mooney*, 54 F.3d at 1213–14 (footnote omitted); *see also Church v. Consolidated Freightways, Inc.*, 137 F.R.D. 294, 307 (N.D.Cal.1991) (stating that the court in *Lusardi* reached its decision only after extensive merit discovery).

Unlike the situation in *Lusardi* where the decision to conditionally certify the class apparently came before discovery on the pertinent issues, plaintiff in this case has had extensive discovery. After discussion with counsel, the court allowed a three-month period for discovery related to plaintiff's class

---

**10.** On remand, the *Lusardi* court examined a variety of factors and again decided to decertify the class noting that the "opt-in plaintiffs performed different jobs at different geographic locations and were subject to different job actions concerning reductions in work force which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis." *Lusardi*, 122 F.R.D. at 465.

allegations. Plaintiff has deposed seven BST management employees. Plaintiff has also had access to numerous discovery documents, including the three documents plaintiff alleges constitute the foundation of his overarching discrimination theory, (the outline of the 1984 meeting, the article in *The Bama News,* and the Hewlett Packard report). Some of the additional documents which defendant produced and plaintiff examined include the following: (1) a report detailing defendant's former management employees who were either awarded CTAP–V or CTAP–I during a one-hundred eighty day period preceding January 11, 1994, (Pl. Ex. G); (2) a report concerning defendant's former management employees who were involuntarily dismissed during the same period, (Pl.Ex. G); (3) a document specifying the years of service for former management employees who were either CTAP–V or CTAP–I recipients or who were involuntarily dismissed during the same period, (Def.Ex. 5, Attachments 3–4); and (4) information on the pay grade, years of service, job description, geographic location, and reason for dismissal of former management employees involuntarily dismissed during the same period, (Def.Ex. 5, Attachments 5).

The discovery to date has already demonstrated that the employees plaintiff proposes to notify are not similarly situated to the plaintiff. As defendant points out, the one hundred fifty-nine CTAP–V recipients, the twenty CTAP–I recipients, and the seventeen involuntary terminations cover all nine [11] of the states in which defendant operates. These employees would therefore be located within separate departments and under separate supervisors. Additionally, the CTAP recipients and the persons involuntarily terminated represent a wide span in ages ranging from forty to seventy-five. (Def.Ex. 5, Attachment 3–4). Also, the involuntarily dismissed employees represent a variety of "pay grades." (Def.Ex. 5, Attachment 5).

Even at this stage, it is clear that any claims of the proposed opt-in plaintiffs would present disparate factual and employment settings.

Further, the specific circumstances of the former employees are notably diverse. For example, the one hundred fifty-nine former employees who participated in the CTAP–V were required to sign an Election and Release agreement. (Def.Ex. 1 at 0074).[12] Participants in CTAP–I were also required to sign an Election and Release agreement. (*Id.* at 0078). On May 18, 1993, plaintiff signed a form acknowledging receipt of a copy CTAP–V plan description. (*Id.* at 0048). The final line of the document asks the recipient to acknowledge that participation in the CTAP–V is entirely voluntary. (*Id.* at 0048–0049). Persons who were involuntarily released did not sign such agreements.

The above facts indicate that the circumstances of employment termination are diverse and that the court, if plaintiff's suggested class were certified, would be faced with numerous individualized defenses.

Because even after extensive discovery plaintiff has been unable to present colorable evidence that there are similarly situated plaintiffs, his request for conditional class certification is due to be denied.

**The Single Filing Rule**

■ Defendant also argues that the "single filing rule" has not been met. A plaintiff must have filed a timely charge of age discrimination with the EEOC before plaintiff may bring a civil action under the ADEA. *See* 29 U.S.C.A. § 626(d) (1994). "[T]he 180 day filing requirement is not jurisdictional and, thus, like a statute of limitations, it is subject to waiver, estoppel and equitable tolling." *Burnam v. Amoco Container Co.,* 755 F.2d 893, 894 (11th Cir. 1985).[13] The court in *Jones v. Firestone Tire*

---

11. Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee.

12. When an employee has executed a valid release, it may be asserted by the employer as a defense to an ADEA action. *Runyan v. National Cash Register Corp.,* 787 F.2d 1039, 1044 (6th

Cir.) (en banc), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986).

13. "The Supreme Court has indicated that questions concerning the time requirements for filing an EEOC charge under Title VII and the ADEA ... call for parallel analysis." *Burnam,* 755 F.2d at 895 n. 2.

*and Rubber Co., Inc.* stated the following regarding the single filing rule in the Title VII context:

> Pursuant to the "single-filing rule," "[a]s long as at least one named plaintiff timely filed an EEOC charge, the precondition to a Title VII action is met for all other named plaintiffs and class members." This rule encompasses two essential requirements: "First, at least one plaintiff must have **timely** filed an EEOC complaint that is not otherwise defective.... Second, the individual claims of the filing and non-filing plaintiffs must have arisen out of **similar discriminatory treatment in the same time frame.**"

*Jones v. Firestone Tire and Rubber Co., Inc.*, 977 F.2d 527, 532 (11th Cir.1992) (emphasis added) (citations omitted).

■ A putative plaintiff may only "opt-in" to plaintiff's suit if the putative plaintiff could have timely filed his own administrative charge on the same date that plaintiff filed his notice with the EEOC. "Claims that were time-barred on the date that plaintiff filed his suit cannot be revived by the commencement of a putative class action." *Pandis v. Sikorsky Aircraft Div. of United Technologies Corp.*, 431 F.Supp. 793, 798 (D.Conn.1977).

While plaintiff has filed an EEOC charge, there is no evidence that any of his potential class members have filed charges of their own. The court agrees with defendant that plaintiff's charge is timely only as to his discharge in July 1993. First, the V.E.E.R.[14] and V.E.E.R. '91,[15] early retirement plans have not been utilized by defendant since 1991. The May 18, 1993 offering of a CTAP–V to universe number WS:038 closed beyond the statutory period established in § 626(d)(1).[16] Plaintiff also states he was offered a CTAP–V in June of 1993. (Complaint, ¶ 59–65 at 12–13). This offering also occurred beyond the statutory period. Finally, plaintiff's transfer from Atlanta to Birmingham in 1991, and plaintiff's lateral transfer in 1992 all occur outside of the statutory period.

Because any opt-in plaintiffs' claims are restricted to the claims which were timely raised in the representative plaintiff's EEOC charge, only managers who, like the plaintiff, were involuntarily terminated for cause, could be proper opt-ins into this case (if their claims were deemed similar to plaintiff's timely claim.) Because plaintiff did not take CTAP–V or CTAP–I, any potential opt-ins who allege discrimination as a result of these plans do not have claims which arise out of the alleged discrimination of which plaintiff complains. Thus, these individuals may not travel on plaintiff's EEOC charge.

### Order Compelling Defendants to Produce Names and Addresses of Putative Class Members

■ The Supreme Court in *Hoffmann–LaRoche, Inc. v. Sperling*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) found that district courts have the authority to permit the discovery of the names and addresses of potential class members. *Hoffmann*, 493 U.S. at 170, 110 S.Ct. at 486. The Court stated that under appropriate circumstances, district courts have the discretion to facilitate notice to potential plaintiffs. *Id.* at 169, 110

---

**14.** "The [V.E.E.R.] is effective December 1, 1990 and applies to those eligible employees who make an election during the period from December 1 to December 31, 1990 to voluntarily separate from employment and who voluntarily separate from employment pursuant to the Plan on a date determined by the participating company after consultation with the employee no later than April 30, 1991." (Def.Amended Notice Ex. 1 at 0119–20).

**15.** "The [V.E.E.R. '91] is effective June 1, 1991 and applies to those eligible employees who make an election during the period from June 1 to July 31, 1991 to voluntarily separate from employment and who voluntarily separate from employment pursuant to the Plan on a date de-

termined by the participating company after consultation with the employee no later than October 31, 1991." (Def.Amended Notice Ex. 1 at 0146).

**16.** Plaintiff's CTAP–V Document Receipt Acknowledgment form indicates that the " 'Submission Deadline' " is designated on the CTAP–4. (Def.Ex. 1 at 0048). The CTAP–4 form states "[t]he date the departmental representative holds the discussion with the employee(s) shall be entered as the Discussion Date. The Submission Deadline shall be at least 45 days from the date of discussion." (Def.Ex. 1 at 0073). Defendant states that the offer closed on July 6, 1993. (Def.'s Brief at 17).

S.Ct. at 485–86. The Court stated that the district court appropriately permitted discovery of the names and addresses of discharged employees after the Court found "that the discovery was relevant to the subject matter of the action and that there were no grounds to limit the discovery under the facts and circumstances of [the] case." *Id.* at 170, 110 S.Ct. at 486.

In contrast to the facts in *Hoffmann–La-Roche,* the discovery of names and addresses of potential class members in this case is not relevant to the ADEA action as this court has decided to deny plaintiff's motion for conditional class certification. The evidence produced through discovery indicates that plaintiff's claim is sufficiently personal and individual in nature as to preclude class action treatment under § 216(b). Plaintiff has discovered the documents which he argues conclusively establish an overarching practice of age discrimination by defendant. Plaintiff states that the purpose of notice is to inform potential plaintiffs of the litigation so that they may decide whether or not to participate; however, plaintiff has failed to establish that "similarly situated" plaintiffs actually exist. Consequently, this court finds that sufficient grounds exist to limit plaintiff's discovery by declining to compel defendant to provide plaintiff with the requested names and addresses.

## CONCLUSION

An order denying plaintiff's motion for conditional class certification will be entered contemporaneously with this opinion.