Norman MUELLER, et al., Plaintiffs,

v.

CBS, INC. f/k/a Westinghouse, Inc., Defendant.

Civ.A. No. 99–1310.

United States District Court, W.D. Pennsylvania.

Jan. 3, 2001.

Gary F. Lynch, New Castle, PA, Colleen E. Ramage, Ramage & Valles, John T. Tierney, David B. Rodes, Theodore Goldberg, Goldberg, Persky, Jennings & White, Edward A. Olds, Lindsay S. Mork, Leven, Surloff, Smith & Cohen, Robert B. Smith, City of Pittsburgh Department of Law, Pittsburgh, PA, Robert H. Kutz, Greensburg, PA, for plaintiffs.

Amy E. Dias, Jones, Day, Reavis & Pogue, Sheila M. Ford, Ford & Council, Pittsburgh, PA, Glen D. Nager, Robert H. Klonoff, Andrew M. Kramer, Thomas M. Beck, Jones, Day, Reavis & Pogue, Washington, DC, James P. Hollihan, George M. Medved, David J. Kolesar, Henry W. Ewalt, Pepper Hamilton, Eric J. Sobczak, CBS Corp., Pittsburgh, PA, for defendant.

Christopher K. Ramsey, Morgan, Lewis & Bockius, Pittsburgh, PA, for movants.

### OPINION and ORDER OF COURT

AMBROSE, District Judge.

Pending before this Court is a Motion by Plaintiffs for Approval to Send ADEA Notice Pursuant to Section 16(b) of the Fair Labor Standards Act (Docket No. 83.) For the reasons set forth below, Plaintiff's Motion is denied without prejudice pending certain modifications to the class definitions and the Notice.

### I. INTRODUCTION

## A. *Factual History*[1]

Plaintiffs Norman Mueller, Harry Bellas and Marian Oshinsky[2] initiated this action on August 13, 1999, alleging that CBS, Inc. ("CBS"),[3] violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* and the Employee Retirement Income Security Act of 1974 ("ERISA") as amended, 29 U.S.C. § 1001 *et seq.* The claims are based on an alleged systematic discrimination against older CBS professional and management employees between January 1, 1994 and December 31, 1999 and focus on the manner in which job terminations were conducted and pension plan benefits modified.

Plaintiffs Mueller and Bellas were, respectively, 62 and 51, when they were fired from their positions with CBS in the late 1990s. Both had worked for the corporation for about 30 years, their last positions being in the Energy Systems Business Unit (ESBU). Mueller was a manager in the Nuclear Products Division of the ESBU where he was the oldest of 12 managers and the only one fired on April 30, 1998 when his division was merged with another. Mueller was within six months of reaching the 30–year service point with CBS when he was let go. Bellas was a project manager in Alabama when he, along with several older employees, was fired on September 15, 1997. (Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, Docket No. 12, at 4.) In both cases, Plaintiffs allege that younger employees were treated more favorably than they and that age played a decisive role in determining which employees within their respective groups were terminated. They fur-

ther allege that as CBS underwent numerous downsizing efforts in the 1990s,[4] age was a criterion in making other employment decisions in connection with those cut-backs, particularly among professional and managerial employees over 40 years of age. The other significant aspect to this corporate-wide practice and policy of eliminating older workers, Plaintiffs allege, was that CBS sought to resolve a massive deficit in its unfunded pension plan by reducing the amount (and thus the cost) of benefits payable to those workers.

Plaintiffs assert that to avoid liability for age discrimination in connection with the downsizing efforts, CBS instituted a policy of requiring older workers to sign releases when they were laid off. CBS allegedly represented to them that unless they signed the releases, they could not receive their vested pension benefits in a lump sum, an option available to all workers under the Westinghouse Pension Plan ("the Pension Plan") in place at the time. Plaintiffs claim they were not aware that the releases were ineffective inasmuch as they were obtained through misrepresentation, violated federal regulations, and did not satisfy the requirements of the Older Worker Benefit Protection Act.

## B. *Procedural History of ADEA Claims*

Plaintiffs satisfied all procedural and administrative prerequisites to filing this action by filing timely charges of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiffs Mueller and Bellas filed their EEOC complaints on December 21, 1998.[5] The statutorily re-

---

1. Unless otherwise noted, the facts in this section are taken from Plaintiff's Second Amended Complaint, Docket No. 19.

2. Marian Oshinsky was employed by Westinghouse until March 25, 1999 when the business unit for which she worked was sold to Westinghouse Electric Co., LLC. Ms. Oshinsky continued to work for the new entity until her eventual retirement on September 1, 1999. Appendix to Plaintiffs' Response to Defendant's Motion to Dismiss, Exh. M, Docket No. 15.

3. CBS is the successor-by-name-change of Westinghouse Electric Corporation.

4. CBS employed approximately 135,000 individuals world-wide in 1990. After numerous downsizing efforts, divestiture of many business units, and reorganizations, the workforce in the United States declined from 62,000 in 1993 to 21,000 in 1997. Appendix to Plaintiffs' Response to Defendant's Motion to Dismiss at 1.

5. Although this filing date would normally have put Bellas' EEOC claim more than 300 days beyond his termination date and thus barred, I determined that he had adequately alleged facts to invoke the equitable tolling doctrine as set forth in *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380 (3d Cir.1994). *See* Memorandum Opinion and Order of Court, March 28, 2000, Docket No. 28.

quired investigation period elapsed before Plaintiffs brought this action. (Second Amended Complaint, Docket No. 19, "Sec. Am.Compl.," ¶¶ 1, 17.)

In their Second Amended Complaint, Plaintiffs allege two types of ADEA violation. Count I alleges that CBS violated the Act by using age as the determining factor in the employment transactions by virtue of which Plaintiffs lost their jobs, that is, younger persons were treated more favorably than older employees in making retention decisions. (Sec.Am.Compl., ¶¶ 16–17.) Count III alleges that CBS violated §§ 4(a) and 4(i) of the ADEA, 29 U.S.C. § 623(a) and (i), in that the· company discriminated against Plaintiffs in the terms, conditions and privileges of employment based on their age, specifically by freezing benefits under the Pension Plan, attempting to remove job separation benefits from the Plan and refusing to award this benefit to older employees. (Id., ¶¶ 21–23.) Plaintiffs further allege that these violations were willful, thus entitling them to double damages under Section 7(b) of the Act. 29 U.S.C. § 626(b). .

Plaintiffs filed their suit in the form of a class action. (Sec.Am.Compl., ¶¶ 40–47.) I denied without prejudice their Motion to Certify the Class solely under Rule 23 of the Federal Rules of Civil Procedure. (Docket No. 3; Memorandum Opinion and Order, February 7, 2000, Docket No. 16.) Plaintiffs subsequently moved for, and were granted, discovery regarding class certification issues only. (Docket No. 34 and Order of May 25, 2000, respectively.) Plaintiffs now seek the Court's approval of a proposed ADEA Notice (the "Notice") to prospective members of the class and authorization to send the Notice to those putative class members [6] according to a list of names and addresses to be provided by Defendant. (Motion for Approval to Send ADEA Notice Pursuant to Section 16(b) of the Fair Labor Standards Act and Proposed Notice attached thereto, "Motion for ADEA Notice," Docket No. 83.) Both parties have fully briefed the Court on these issues.

This Court has jurisdiction pursuant to 29 U.S.C. § 626(c).

## II. CONDITIONAL CERTIFICATION OF AN ADEA CLASS

■ The ADEA prohibits· discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). The Act further provides that it is to be enforced "in accordance with the powers, remedies and procedures" of designated sections of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 203 et seq. 29 U.S.C. § 626(b). Plaintiffs now request certification of a collective action as prescribed by FLSA § 216(b) which provides, in pertinent part, that

An action ... may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b); see also Nowicki v. USX Corp., 672 F.Supp. 854, 855 (W.D.Pa.1987).

Unlike class actions certified under Rule 23, would-be plaintiffs must "opt in" according to Section 216(b) in order to be bound by any judgment reached in an ADEA "collective action." Under the Supreme Court ruling in Hoffmann–La Roche, Inc. v. Sperling, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989), it is appropriate for this Court to facilitate the opting-in process by approving the class description(s) and a notice prepared by the plaintiffs for distribution to the members of those class(es), and by ordering the defendant to provide their names and addresses. Hoffmann–La Roche, id. at 169–170, 110 S.Ct. 482.

An ADEA class certification action proceeds in two phases. The first step is the "notice phase" which begins when the plain-

---

**6.** I am cognizant of the fact that under the ADEA, the proper terminology is to a "collective action" and to "unnamed" or "party" plaintiffs. However, like numerous courts before this one, I shall borrow the general language of "class" and "class members" from Fed.R.Civ.P. 23. See, e.g., Sperling v. Hoffmann–La Roche, Inc., 118 F.R.D. 392, 399 (D.N.J.1988).

tiff seeks authorization to issue notice to other prospective class members. Usually this occurs at an early stage of the proceedings and the court determines the viability of a possible class based on the claim and affidavits in support thereof. *Morisky v. Public Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493, 497 (D.N.J.2000). A court may conditionally certify the class for purpose of notice and discovery under a comparatively liberal standard, i.e., by determining that the members of the putative class "were together the victims of a single decision, policy or plan." *Sperling v. Hoffmann–La Roche, Inc.,* 118 F.R.D. 392, 407 (D.N.J.), *aff'd,* 862 F.2d 439 (3d Cir.1988) and *Hoffmann–La Roche,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480, supra. The second phase occurs when all putative class members have filed their consents to opt-in and further discovery has taken place to support the plaintiff's assertions that the defendant violated the ADEA and the matter is ready for trial. *Morisky, id.* The court then reconsiders the class certification question using a "similarly situated" standard, that is, by conducting a fact-specific review of each class member who has opted-in, taking into account factors such as employment setting, termination procedures, defenses asserted against various plaintiffs, and other procedural issues. *Spellman v. VisionQuest National, Ltd.,* 1998 U.S.Dist. LEXIS 4298, *4–6 (W.D.Pa., February 13, 1998). If the court determines that the plaintiffs are not "similarly situated," the conditional class is decertified. *Spellman, id.*

Although this case has been pending for over a year, this is the first point at which Plaintiffs have requested notice approval and conditional certification. As noted above, Plaintiffs filed their complaint as a class action and early on moved for class certification, which was denied pending discovery on the question of suitability for certification under either Section 7(b) of the ADEA and/or Fed.R.Civ.P. 23 for the ERISA claim. Plaintiffs now propose two ADEA subclasses:

> All United States citizens employed by defendant who were designated by defendant as "Professionals" or "Managers" and who were, at any time between January 1, 1994 and December 31, 1999, involuntarily terminated from employment with defendant (or who elected retirement after being informed that their employment with defendant was going to be involuntarily terminated) and who were, at the time of such involuntary termination (or retirement) at least 40 years of age or older.

> All participants in the Westinghouse Electric Company Pension Plan who were 40 years of age or older on January 1, 1995 and who took the "lump sum" option between January 1, 1995 up to the present.

Motion for ADEA Notice at 1.

Plaintiffs argue that their preliminary discovery shows that members of the two proposed sub-classes were similarly situated regarding age discrimination as it applied to job terminations and to the 1994 modifications of the Plan. (Brief in Support of Plaintiffs' Motion for Approval to Send ADEA Notice, "Plfs.' Brief," Docket No. 84.) They allege that they and the putative class members were victims of a corporate-wide policy instituted soon after Michael Jordan became CEO of Westinghouse in 1993 and initiated a policy of eliminating "blockers," i.e., older employees who were slowing the upward career progress of younger, more aggressive and talented employees. (Plfs.' Brief at 8.) Plaintiffs offer evidence of this policy in the form of deposition testimony by Mr. Jordan; excerpts from reports of the "Chairman's Initiative" meetings held in 1994 between Jordan and upper level managers of the company, the tone of which, Plaintiffs allege, reflects a corporate culture antagonistic to older workers; and statistical analyses that indicate termination rates for older workers in the period 1994–1999 far exceeding the normal range of probabilities. (*Id.* at 11–14.)

CBS argues that Plaintiffs' repeated changes of the class definition alone should be sufficient to preclude granting the motion to send notice to the class members because allowing Plaintiffs to repeatedly modify the class definition will "sandbag" CBS and abandon unnamed class members whom Plaintiffs purported to represent at the beginning of this suit. (Def.'s Opposition to Plaintiffs' Motion for ADEA Notice, "Def.'s Opposition," Docket No. 103, at 15.) The

class was initially defined as "all former employees of Westinghouse who were terminated after January 1, 1994 and who were at least 40 years of age when terminated." (Sec.Am.Compl., ¶ 40.) Discovery was ordered specifically for the purpose of better determining the parameters of the class. If anything, Plaintiffs have successively restricted the class to smaller and smaller groups of individuals, for example, now requiring that putative class members be United States citizens, professionals or managers, or those who took the lump sum option as part of their termination package. "A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir.1993), *see also, Chisolm v. TranSouth Financial Corp.*, 194 F.R.D. 538, 557–558 (E.D.Va.2000), rejecting defendant's motion to decertify a RICO class under Rule 23 and creating, sua sponte, three plaintiff subclasses.

CBS also argues that because we are now at the "post-discovery stage," the Court should apply the more stringent "similarly situated" standard and require Plaintiffs to provide proof that common issues predominate and that the defendant can receive a procedurally fair trial. (Def.'s Opposition at 11.) In other words, Defendant is asking me to find that members of the collective action are similarly situated before I know who those members are and what the conditions were that led to their termination. I decline to make such a prognostication.

I conclude that both Plaintiffs and Defendant are attempting to move too quickly. Although Defendant insists I apply the "similarly situated" standard at this point and Plaintiffs insist they can meet that standard, inasmuch as no class members have yet been identified or contacted and no other plaintiffs have opted into the collective action, it is impossible to determine whether the class members are similarly situated or not. As the district court pointed out in *Sperling*, to require conclusive finding of "similar situations" before providing notice to the absent class members

would condemn any large class claim under the ADEA to a chicken-and-egg limbo in which the class could only notify all its members to gather together after it had gathered together all its members and from which the class could escape only by refusing entry after some unpublicized cut-off date to additional class members who thereafter stumble upon the case by themselves. Such a scheme would of course violate the twin policies … [that] support court participation in ADEA-class notice in the first place: broad ADEA remediation and judicial economy. In addition, to allow notice before the "similarly situated" issue is decided would insure that all possible class members who are interested are present, and thereby assure that the full "similarly situated" decision is informed, efficiently reached, and conclusive.

*Sperling*, 118 F.R.D. at 406.

■ The appropriate standard for the court's review at this point is whether the plaintiff has demonstrated "a sufficient factual basis on which a reasonable inference could be made that defendant[ ] orchestrated or implemented a single decision, policy or plan to discriminate against their … employees on the basis of age." *Brooks v. BellSouth Telecommunications, Inc.*, 164 F.R.D. 561, 567 (N.D.Ala.1995). I conclude that Plaintiffs have provided sufficient facts to support such an inference but deny their motion to conditionally certify the classes they propose until certain amendments are made to the definitions thereof.

### III. *PLAINTIFFS' PROPOSED NOTICE*

CBS notes that the class, if certified, should be limited to those individuals who were eligible to file their own EEOC claims as of the date on which Plaintiff Mueller filed his claim, that is, December 21, 1998. This would limit the class to individuals whose alleged age discrimination occurred on or after February 24, 1998. (Def.'s Opposition at 10, note 3.) However, for two reasons, I agree with Plaintiffs that the period for each subclass—at least for the notice and opt-in phase—should begin with January 1, 1994, the date on which the Pension Plan was modified. First, there may be other plain-

tiffs who were actively misled, as Bellas claims to have been, by Defendant's assertions that the release pertaining to the lump sum option was valid and therefore, equitable tolling should be invoked to cover the claims of those putative plaintiffs, as I have already done for Bellas. Second, Plaintiffs argue that CBS engaged in a pattern or practice of discrimination by systematic intentional discrimination against older employees, based on the allegations discussed in Section II above. A pattern or practice is "something more than random or sporadic discriminatory acts," rather it is "a consistent policy of purposeful discrimination" which can be shown by "either a consistent history of discriminatory decision-making in an employer's employment practices or by showing that the employer has an openly declared discriminatory policy." *Sperling v. Hoffmann–La Roche, Inc.*, 924 F.Supp. 1346, 1358 (D.N.J. 1996). Plaintiffs' evidence is sufficient at this point to convince me that if such discrimination took place, it could have been tied to Jordan's policies and to the Pension Plan modifications imposed in January 1994. Therefore, I will allow the January 1, 1994 date to serve as the initial point for determining the scope of the ADEA classes.

I conclude that several elements of Plaintiffs' class descriptions as proposed in the Notice are relatively unambiguous and that the candidate plaintiffs thus described can be readily identified from the personnel records maintained by CBS. That is, for the first subclass, CBS should be able to determine which of its former employees were (1) United States citizens, (2) designated as "Professional" or "Manager," (3) terminated involuntarily between January 1, 1994 and December 31, 1999, and (4) 40 years of age or older at the time of their separation. Likewise, for the second subclass, CBS should be able to identify (1) participants in the Westinghouse Electric Company Pension Plan (2) who were 40 years of age or older on January 1, 1995 and (3) who took the lump sum option after January 1, 1995.

But, Plaintiffs do not explain for the first sub-class how either they or Defendant will distinguish between those putative class members "who elected retirement after being informed that their employment with defendant was going to be involuntarily terminated" and those individuals who chose to retire for their own reasons unrelated to an impending involuntary termination. While this distinction may become clear as further discovery is held after plaintiffs opt-in, it may also be that CBS' termination records already contain such information. In that case, it would be more expeditious for CBS to provide such information to Plaintiffs in order to eliminate those "voluntary terminees" before notice of the collective action is sent.

Nor do Plaintiffs define for the second subclass a termination point for the period which began January 1, 1995 other than the ambiguous "up to the present." This open-ended phrase would theoretically compel the parties to undertake continuing notification to any individual who takes the lump sum option until such time as this litigation is resolved. Conversely, it may be that at some point the lump sum option ceased to be a viable choice under the Pension Plan, in which case the termination date should be moved back accordingly. Because I am unable to determine from the record what date should be appropriate for this sub-class, I am willing to entertain brief arguments from the parties as to alternative closing dates for this class.

It is also my understanding that Plaintiff Marian Oshinsky, who is named as an "Age Act Plaintiff" in the proposed Notice, is not a plaintiff in the ADEA-based counts of this case. (Sec.Am.Compl., ¶ 14.) If that is so, her name should be removed from the Notice.

Furthermore, in order to maintain some semblance of progress in this case which has already been pending for over a year, the postmark deadline for filing a Consent to Join Lawsuit (paragraph 7 of the Notice) will be set by the Court as 60 days from the date of the Notice itself.

## ORDER OF COURT

AND NOW, this **3rd** day of January, 2001, after careful consideration and for the reasons set forth in the Opinion accompanying this Order, it is **ORDERED** that Plaintiffs'

Motion for Approval to Send ADEA Notice Pursuant to Section 16(b) of the Fair Labor Standards Act (Docket No. 83) is **DENIED without prejudice.**

It is further **ORDERED** that:

A.   Defendant is to advise Plaintiffs within ten (10) days of the date hereof as to the availability of information in its records which may be used to identify individuals who retired in the period January 1, 1994 through December 31, 1999 under conditions which did not include a pending involuntary termination as opposed to those who retired in the face of an imminent involuntary separation.

B.   Plaintiffs are to revise the proposed Notice and sub-class descriptions in accordance with the comments of the Court set out in Section III above and to provide the revised Notice to the Court for approval within 15 days of the date hereof.

C.   Both parties are to submit briefs not to exceed five pages supporting their positions as to a fixed termination date for the second sub-class.