Barbara **BRADFORD, individually and on behalf of all others similarly situated, Keith Ling, individually and on behalf of all others similarly situated, John Yendrey, Paula D. Kurzawa, Robert Gill, Ralph Brown, Sharon Co-**

---

oksey, James Nevorski, Hildegard Potesta–Wilcox, Thomas Balaton, Amy Carpenter, Nancy Radillo, Cristian Herlea, Jose Castro, Belinda Fleischer, and Howard Gold Plaintiffs,

v.

**BED BATH & BEYOND, INC., Defendant.**

No. CIV.A.1:98–CV–2556–RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 25, 2002.

Robert Kirtley Finnell, The Finnell Firm, Rome, GA, Martin D. Chitwood, Craig Gordon Harley, Nikole M. Davenport, Chitwood & Harley, Stephen M. Katz, Betts & Katz, Atlanta, GA, for plaintiffs.

Edward Bryon Krugman, Timothy S. Rigsbee, Bondurant Mixson & Elmore, Atlanta, GA, Aaron J. Schindel, M. David Zurndorfer, New York City, for defendant.

## ORDER

STORY, District Judge.

Plaintiffs filed this putative collective action pursuant to section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). They allege that they were not paid overtime for hours worked in excess of forty (40) per week. In a previous order, the Court granted permission to send notices of the pendency of this action to current and former Bed Bath & Beyond ("BB & B") department managers, the potential opt-in plaintiffs. Those notices were sent, and more than 300 consent forms were filed with the Court. When authorizing the notices, the Court indicated that the collective action issue could be revisited on a more developed factual record. Toward that end, the parties were allowed to conduct discovery from twenty-five (25) of the opt-in plaintiffs, including the named Plaintiffs and six (6) other opt-in plaintiffs chosen by Defendant. That discovery has been conducted, and the Court now considers Defendant's Motion To Decertify Putative Collective Action [170–1]. After reviewing the record and considering the arguments of the parties, the Court enters the following Order.

### Background

Plaintiffs worked as "department managers" at twenty-four (24) different BB & B stores in eleven states. Employees in these positions were paid on a salary basis. They seek to recover payment of unpaid overtime wages, along with liquidated damages, to compensate for BB & B's alleged violation of the FLSA. Plaintiffs further assert that their job duties did not include directing, managing, terminating, or disciplining more than two (2) employees, and they reportedly spent less than twenty-five (25) percent of their time performing managerial, discretionary, administrative, or executive tasks.

## Discussion

■ Pursuant to the FLSA, employees "engaged in commerce or in the production of goods for commerce" must receive one and a half times their regular rate of pay for hours worked in excess of forty (40) hours each week. 29 U.S.C. § 207(a)(1). An employer violating this provision can be liable for the unpaid overtime compensation plus "an additional equal amount as liquidated damages." *Id.* § 216(b). To recover unpaid overtime compensation, employees may maintain an action against an employer collectively if a representative employee can demonstrate that the employees are "similarly situated." *Id.* § 216(b). The representative plaintiffs bear the burden of demonstrating that they and the class members they seek to represent are similarly situated. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir.1996). This burden is not a heavy one. *Id.* at 1097. Plaintiffs need not show that their positions are identical to the putative class members' positions; a class may be certified under the FLSA if the named plaintiffs can show that their positions were similar to those of the absent class members. *Id.* at 1096; *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir.1995). Significantly, this similarly situated standard is less stringent than Rule 20(a)'s "same transaction or occurrence" requirement for joinder and than Rule 23(b)(3)'s requirement that a class may only be certified if "common questions predominate." Fed. R.Civ.P. 20(a), 23(b)(3); *See Grayson*, 79 F.3d at 1096. In the present case, the Court conditionally certified a collective action pursuant to the FLSA, authorizing notice to potential opt-in plaintiffs and agreeing to revisit the "similarly situated" issue after limited discovery.

■ A defendant may move to decertify the class if the evidence shows that the members of a conditionally certified class are not similarly situated. *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 365 (M.D.Ala.1999). Defendant so moves here, arguing that the class should be decertified because the members of the class had widely differing job duties. Defendant's analysis focuses on whether the factual record as developed through discovery supports Plaintiffs' classification as exempt employees under the FLSA. Plaintiff also focuses on whether Plaintiffs fit the definition of exempt. The Court need not decide on the pending motion whether Plaintiffs qualify as exempt employees. The only determinative issue is whether Plaintiffs' job duties were similar.

While the Court need not determine whether Plaintiffs properly would be classified as exempt employees, understanding the FLSA provisions regarding exempt status highlights the material fact issues. Hence, a brief overview of the applicable FLSA provisions and regulations follows. The FLSA's requirement of overtime benefits does not apply to every employee. Depending on an employee's activities, he may not be entitled to overtime compensation. For example, employers are not required to provide overtime benefits to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).[1]

The administrative regulations provide a "short test" to classify employees for the

---

1. These statutory terms are further explained by administrative regulations:

The term employee employed in a bona fide executive ... capacity in section 13(a)(1) of the act shall mean any employee:

(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and

purpose of the FLSA's executive exemption. The short test looks at whether: (1) the employee is paid a salary of more than $250 per week; (2) the employee's primary duty is the management of the enterprise or a subdivision; and (3) the employee regularly directs the work of two or more employees. 29 C.F.R. § 541 .1(f). To determine whether an employee's "primary duty" involves management, the regulations suggest consideration of: (1) the time spent performing non-managerial tasks; (2) the frequency of discretion; (3) the freedom from supervision; (4) the difference in wages paid to hourly associates versus executives; and (5) the relative importance of managerial tasks and collateral assignments. *Id.* § 541.103. In sum, whether an employee is considered exempt for the purpose of overtime benefits is determined by looking at supervisory responsibility, authorization to make independent decisions, and the amount of time spent performing non-managerial tasks.

■ The Court has undertaken a detailed review of the representative opt-in Plaintiffs' depositions, focusing on whether the job duties of the deponents were substantially similar in light of these key considerations. Defendant suggests that, in considering whether the record supports a conclusion that class members are similarly situated, the Court should look at the employment setting and factual situation, whether defenses individual to each plaintiff exist, and fairness and procedural considerations, citing *Brooks v. BellSouth Telecomm.*, 164 F.R.D. 561 (N.D.Ala.1995), *aff'd without op.*, 114 F.3d 1202 (11th Cir. 1997). This outline for the analysis is a useful one.

## I. Employment Setting and Factual Situation

■ As an initial matter, the evidence submitted shows that the employment setting was similar for Plaintiffs. Each member of the class worked in a retail store selling household goods, including a so-called "hard side" and "soft side." [2] The store sold organization supplies, appliances, dishes, pots and pans, bed, bath, and table linens, and seasonal merchandise, *inter alia.* Plaintiffs subject to discovery testified that the stores were each managed according to a hierarchy including a store manager, two or more assistant store managers, an operations manager, and various department managers.[3] Some stores had additional intermediate management, often called senior managers [4] or

---

(b) Who customarily and regularly directs the work of two or more other employees therein; and
(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and
(d) Who customarily and regularly exercises discretionary powers; and
(e) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section[.]

29 C.F.R. § 541.1.

2. *See, e.g.,* Keil Dep. at 52 (stating that he was manager of "soft side" and that another manager ran "hard side").

3. *See, e.g.,* Shapiro .Dep. at 60 (worked in two stores and both had same management structure); Keil Dep. at 45 (worked in two stores with same management structure).

4. Oriotis Dep. at 78 (noting that senior managers had keys and a senior manager was above department manager level); Webster Dep. at 85 (relating that one could be promoted from department manager to senior manager and get keys to store).

personal shopper managers,[5] and managers who served both individual store functions and regional functions involving more than one store.[6] According to the testimony, the store manager had the final say as to how the store would function, with the assistant managers exercising more discretion than department managers and serving as "manager on duty" in the store manager's absence. Furthermore, the store manager and the assistant managers were "keyholders," possessing authority to open and close the store. This keyholding responsibility was assigned sometimes to an intermediate manager referred to as a "senior manager."[7] This setting is described again and again by the deponents.

Plaintiffs' job duties, while not identical, were very similar. BB & B argued on an earlier motion that no overriding corporate directive governed the management of the stores, allowing for different management arrangements according to the person managing a particular store. Supposedly, job duties could be markedly different depending on the store. Defendant contends that BB & B follows a

"store within a store" approach, giving department managers responsibility to manage their departments. (Def.'s Br. at 23.) The evidence does not demonstrate that this model resulted in many practical differences among the stores, and the testimony shows that the position of department manager included similar responsibilities regardless of the store.

Upon reviewing the depositions, the Court has divided the duties described by Plaintiffs into the following categories: merchandising, customer service activities, supervising, training, scheduling, hiring, evaluating, disciplining, ordering and inventory responsibilities, sales responsibilities, and keyholding. The department managers' job responsibilities will be described in relation to these categories.

Plaintiffs uniformly testify that the main duty of a department manager was unpacking freight and putting items on the shelves.[8] In addition, the department managers moved merchandise in accordance with specific direction from the store manager.[9] They report that their merchandising tasks as department managers

---

5. Tabor Dep. at 84–85 (characterizing move from assistant manager to personal shopper manager as lateral move); Oriotis Dep. at 86 (explaining that store had personal shopper managers with responsibilities for customer service and displays).

6. After serving as a department manager, one deponent took on an unusual role in his store. Referred to as "HR manager," George Oriotis completed the payroll, kept track of associate hours, screened and hired applicants, assisted with hiring for new stores, and attended job fairs. Oriotis Dep. at 34 ("HR manager"); id. at 31 (payroll); id. at 47 (associate hours); id. at 35–6 (screened applicants both for his store and for new stores); id. at 154 (attended job fairs).

7. See supra note 4.

8. Gill Dep. at 57 (keeping shelves neat and full); Webster Dep. at 43 (getting freight worked was priority); id. at 45 (basic responsibilities were opening boxes, stocking shelves, and moving merchandise); Herlea

Dep. at 42 (main job was putting away freight); id. at 64 (testifying that 70% of time was spent putting away merchandise); Kurzawa Dep. at 52, 59 (main responsibility was putting merchandise out and hauling freight); Brown Dep. at 32 (job responsibilities included unloading trucks, pricing merchandise, and putting stock away); Nevorski Dep. at 45 (describing job responsibility as pricing merchandise and putting it away); Castro Dep. at 72 (put stock away all day long); Cooksey Dep. at 34 (stocking shelves); Yendrey Dep. at 20, 26 (main responsibility was stocking shelves); Oriotis Dep. at 25 (responsibility for putting out stock); Shapiro Dep. at 35, 65 (opening boxes and putting out stock was major responsibility); Tabor Dep. at 48 (most of day was spent restocking); Keil Dep. at 28 (put away freight).

9. Webster Dep. at 46 (store manager made decisions about where merchandise was placed); Herlea Dep. at 42 (there was a plan for where things were stocked); Carpenter Dep. at 41 (store manager determined place-

were not different from the tasks assigned to the hourly associates. According to the deponents, department managers exercised little discretion in merchandising their departments, but upper management could decide where merchandise would be placed.[10]

Another main responsibility of BB & B department managers was assisting customers.[11] The department managers routinely waited on customers, answering questions about products and directing them to certain areas of the store. Plaintiffs also assisted customers by serving as cashiers.[12] Some deponents testify that they sometimes observed associates, noting whether customers were being helped.[13] Defendant emphasized that while deponents were assisting customers, they were training hourly employees by serving as role models for good customer service. However, it appears from the deposition testimony that the deponents did not view that as their role prior to that suggestion by the defense counsel's questions.

Although Plaintiffs were termed managers, they had little supervisory responsibility. Most testified that they worked alongside the hourly associates but did not have authority to direct their activities or assign tasks.[14] Others stated that there

ment of merchandise); Nevorski Dep. at 47 (department manager had no discretion to decide placement of merchandise); Castro Dep. at 93–94 (managers specified placement of merchandise but department managers sometimes made suggestions); Yendrey Dep. at 29 (department managers had no authority to decide merchandise placement); Fleischer Dep. at 56 (put things where store manager specified); Gold Dep. at 37 (moved merchandise according to instructions); Wilcox Dep. at 28 (filled floor according to instructions); Keil Dep. at 36 (put away merchandise according to instructions); Shapiro Dep. at 40 (placement decisions were often overridden); McNeil Dep. at 40 (management decided where to place items). *But see* Oriotis Dep. at 26 (discretion to place merchandise).

**10.** Tabor Dep. at 62 (could direct placement of merchandise as assistant manager); Keil Dep. at 48, 52 (could decide where to place merchandise as assistant manager and direct department managers to place products in particular location).

**11.** Herlea Dep. at 69 (spent 25% of time assisting customers); Brown Dep. at 32 (assisted customers); Nevorski Dep. at 49 (same); Shapiro Dep. at 35 (same); Cooksey Dep. at 34 (same); Castro Dep. at 72 (same); Wilcox Dep. at 27 (improved customer service by waiting on customers); Webster Dep. at 48 (everybody waited on customers).

**12.** Kurzawa Dep. at 53 (served as cashier); Brown Dep. at 32 (same); Castro Dep. at 79 (worked as back-up cashier); Yendrey Dep. at 20 (same); Oriotis Dep. at 29 (same); Shapiro Dep. at 36 (same); Keil Dep. at 29 (same).

**13.** Oriotis Dep. at 83 (observed associates helping customers but had no authority to counsel associates); Nevorski Dep. at 90 (sometimes conducted customer service walks); Wilcox Dep. at 34 (made notes about customer service in store); Shapiro Dep. at 123 (made sure customers got helped); McNeil Dep. at 40 (on occasion informed managers that associates were not handling customers well).

**14.** Nevorski Dep. at 45 (no responsibility to supervise associates); Kurzawa Dep. at 60 (did not direct associates' work); Cooksey Dep. at 34, 39 (did not supervise associates); Yendrey Dep. 27 (never assigned tasks or assured that associates were doing job); Fleischer Dep. at 54–5 (could tell associates tasks that upper management wanted completed but did not oversee associates); Gold Dep. at 34 (did not assign work); *id.* at 48 (relayed messages from store manager); Wilcox Dep. at 27 (worked together); Oriotis Dep. at 23 (passed on directions from manager); McNeil Dep. at 38, 40 (received "to do" list from management and everyone worked on it together); Tabor Dep. at 81 (department managers worked side-by-side with associates); Shapiro Dep. at 36 (simply pointed associates to where merchandise should be placed); Webster Dep. at 47–48, 50 (collaborated with associates to decide who would take on each task).

were no associates to supervise.[15] On a related note, department managers rarely trained associates, unless they assisted with register training.[16] Notably, department managers who were promoted did get more training responsibility.[17]

With regard to scheduling, the deponents testified that they had little or no discretion to draft schedules for subordinate employees.[18] Even those department managers who routinely wrote schedules simply submitted a draft to the upper level managers, who significantly revised it before issuing a final version.[19] In addition, department managers had no authority to approve or deny vacation time, with the exception of the ministerial task of calculating the number of vacation

hours available for a particular employee.[20] In contrast, one deponent who served as a department manager prior to being promoted to a higher management position stated that, as assistant manager, she received a draft schedule from the department managers, which she had the authority to approve, disapprove, or rewrite before issuing a final version.[21]

In relation to personnel, department managers had very little responsibility. First, Plaintiffs testified that they had little or no role in the hiring process.[22] Next, according to Plaintiffs, evaluating employees' performance was not the responsibility of the department managers, but some department managers report talking to upper management about em-

---

15. Brown Dep. at 34.

16. Many Plaintiffs stated that they had no responsibility for training. Herlea Dep. at 41; Carpenter Dep. at 34; Kurzawa Dep. at 54; Cooksey Dep. at 36; Yendrey Dep. at 28; Gold Dep. at 33; Wilcox Dep. at 26; Shapiro Dep. at 36, 64; Tabor Dep. at 48; Keil Dep. at 37 (associates were responsible for register training). Several Plaintiffs reported that they taught new employees how to use the register. Gill Dep. at 31; McNeil Dep. at 53; Fleischer Dep. at 64.

17. Tabor Dep. at 77–79 (starting conducting product knowledge seminars as assistant manager).

18. Some department managers testified that they did not prepare schedules. Carpenter Dep. at 33; Kurzawa Dep. at 54; Brown Dep. at 34; Nevorski Dep. at 47; Cooksey Dep. at 36; Yendrey Dep. at 28. Other managers did formulate a draft schedule for the department, which was presented to upper management for approval. Gill Dep. at 28–29; Herlea Dep. at 60; Fleischer Dep. at 51; Gold Dep. at 58; Oriotis Dep. at 159; Shapiro Dep. at 37 (stating that he scheduled two staff members but that scheduling took insignificant amount of time); Webster Dep. at 58 (testifying that he prepared schedule according to form).

19. Even Plaintiffs who prepared department schedules stated that upper management generally revised the draft schedule. Herlea Dep. at 62; Fleischer Dep. at 51; Gold Dep. at 58; Shapiro Dep. at 64; Tabor Dep. at 47.

20. Even the department managers who prepared draft schedules possessed no authority to approve vacation time. Gill Dep. at 29; Nevorski Dep. at 50; Oriotis Dep. at 138; Webster Dep. at 59; Shapiro Dep. at 38; McNeil Dep. at 48; Gold Dep. at 35 (testifying that he merely took note of days employees wished to take off); see also Oriotis Dep. at 138 (testifying that he counted number of vacation days allotted to employee and made note for upper management).

21. Tabor Dep. at 77.

22. Most deponents had no responsibility for hiring or interviewing. Gill Dep. at 37; Herlea Dep. at 41; Kurzawa Dep. at 55, 71; Radillo Dep. at 28; Brown Dep. at 34; Cooksey Dep. at 36; Castro Dep. at 90; Yendrey Dep. at 28; Gold Dep. at 33, 72; Oriotis Dep. at 73; Shapiro Dep. at 36, 61, 90; Tabor Dep. at 73–74; Keil Dep. at 46. Others participated in the hiring process on rare occasions. Carpenter Dep. at 35 (one interview); Fleischer Dep. at 52–53 (one or two preliminary interviews); McNeil Dep. at 37 (accepted applications and gave short overview to applicant).

ployee performance, serving as a witness to evaluations, or filling out evaluations at the specific direction of the store manager.[23] Finally, the department managers usually did not discipline employees, although some served as witnesses for disciplinary actions, documented register mistakes, or complained about associate performance to the store manager.[24] These personnel responsibilities fell to upper management; for example, assistant managers usually possessed authority to interview prospective associates, hire new employees, and terminate employees.[25] Moreover, assistant managers might be responsible for employee evaluations.[26]

Plaintiffs had some responsibilities for the stock in their departments. Across the board, Plaintiffs had no authority to order merchandise for their departments. With limited computer access, they could check inventory and issue "suggested orders" or discuss stock needs with the store manager.[27] Only upper management was authorized to submit final orders.[28] One activity that was sometimes performed by department managers was counting the items in stock.[29] While many department managers identified hot sellers and informed the managers, several Plaintiffs did not perceive tracking sales as a responsibility of their jobs.[30]

**23.** Gill Dep. at 38 (no evaluating); Herlea Dep. at 41 (same); Carpenter Dep. at 36 (same); Castro Dep. at 87 (same); Yendrey Dep. at 28 (same); Oriotis Dep. at 79 (same); McNeil Dep. at 38 (did not review employees or serve as witness); Tabor Dep. at 81 (characterizing evaluations filled out by department managers as "peer evaluations"); Gold Dep. at 34 (could talk to store manager about associate performance); Id. at 51 (served as witness for reviews); *id.* at 54–55 (reviewed one employee at instruction of store manager); Shapiro Dep. at 57 (filled out reviews at instruction of store manager).

**24.** Radillo Dep. at 29 (no discipline); Nevorski Dep. at 56 (same); Cooksey Dep. at 36 (same); Yendrey Dep. at 28 (same); Fleischer Dep. at 55; Gold Dep. at 33, 47 (same); Webster Dep. at 49; Herlea Dep. at 69 (never disciplined associate); Keil Dep. at 46 (needed store manager to document discipline); Oriotis Dep. at 71, 73 (discipline was not responsibility of department manager); Carpenter Dep. at 69 (did not fill out disciplinary reports); Oriotis Dep. at 142 (served as witness); Shapiro Dep. at 101 (same); McNeil Dep. at 48 (same); Webster Dep. at 135 (same); Gill Dep. at 38 (documented register mistakes); Fleischer Dep. at 65 (same); Carpenter Dep. at 36 (complained to manager); Wilcox Dep. at 25 (same); Tabor Dep. at 49 (same); Webster Dep. at 58 (same); McNeil Dep. at 48 (might recommend discipline). *But see* Oriotis Dep. at 144, 147–48 (instructed to write associates up); Shaprio Dep. at 37 (could document minor infractions like tardiness); Castro Dep. at 88 (discussed tardiness with one associate).

**25.** Tabor Dep. at 63, 80.

**26.** Keil Dep. at 55 (did reviews as assistant manager); Tabor Dep. at 80 (got responsibility for evaluating employees as assistant manager).

**27.** Many department managers could use the computer to check inventory. Herlea Dep. at 70; Carpenter Dep. at 37; Brown Dep. at 35; Castro Dep. at 95; Yendrey Dep. at 32; Fleischer Dep. at 57; Tabor Dep. at 58; Webster Dep. at 65. According to some Plaintiffs, no ordering responsibility was delegated to them. Radillo Dep. at 58; Kurzawa Dep. at 71; Carpenter Dep. at 41; Nevorski Dep. at 61; Gold Dep. at 36; Keil Dep. at 31; Brown Dep. at 35. Others merely suggested orders. Herlea Dep. at 43; Cooksey Dep. at 34; Castro Dep. at 102; Shapiro Dep. at 42; Webster Dep. at 64.

**28.** *See, e.g.,* Tabor Dep. at 56 (submitted orders as assistant manager).

**29.** Castro Dep. at 105 (counted merchandise and adjusted numbers); Yendrey Dep. at 29 (submitted merchandise counts): Keil Dep. at 28 (performed counts); Nevorski Dep. at 68 (same).

**30.** Herlea Dep. at 46 (identified hot sellers); Nevorski Dep. at 58 (report what was selling well); Gold Dep. at 42 (could look at what was selling well); McNeil Dep. at 51 (identify hot sellers); Tabor Dep. at 75 (report to manager what was selling well). *But see* Carpen-

Department managers did not hold keys to the store. However, several "front end managers" carried a key to the cash registers that was used to void transactions.[31] A major difference between department managers and more senior managers, including assistant store managers and store managers, was the possession of keys to the store.[32]

On the basis of this review of the evidence, the Court finds that Plaintiffs have come forward with ample evidence to substantiate the claim that department managers employed by BB & B are similarly situated with regard to employment setting and job duties.

## II. Individual Defenses

■ Defendant's main defense to Plaintiffs' claims is that Plaintiffs must be classified as exempt employees who are not entitled to overtime compensation. As explained in the foregoing analysis, this determination is governed by the job duties performed by Plaintiffs. Since the Court has determined that Plaintiffs' job duties were substantially similar, this issue can be adjudicated collectively; therefore, the existence of this defense does not pose any difficulty related to the collective action.

■ Defendant also contends that Plaintiffs are dissimilar because they were paid according to different compensation agreements. First, BB & B asserts that Plaintiffs are different because BB & B had a practice of paying department managers commensurate with previous experience, resulting in a situation where some department managers were paid more

than others. This distinction is unimportant since Defendant admits that all department managers were paid on a salary basis rather than an hourly basis. The differing salaries do not create an individual issue because, if necessary, the compensation due to each Plaintiff can be calculated using a formula to figure the expected hourly rate for each employee based on his or her annual salary. Second, Defendant argues that Plaintiffs should not be allowed to proceed collectively because some Plaintiffs were paid overtime under various payment plans beginning in 1999. Assuming that this statement is true, some Plaintiffs may have already received compensation for overtime worked. The existence of this issue does not preclude collective adjudication of the exemption issue. At worst, if Plaintiffs are classified as non-exempt employees, some individual damages hearings may be required.

## III. Fairness and Procedural Concerns

Defendant argues that refusing to allow a collective action in this case is not unfair because each Plaintiff can pursue his or her claims individually. As a practical matter, Plaintiffs can hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action.

According to Defendant, Plaintiffs are not similarly situated because the representative Plaintiffs, on average, were employed by BB & B for a shorter tenure

ter Dep. at 37 (did not track sales); Kurzawa Dep. at 61 (same); Yendrey Dep. at 41 (same); Shapiro Dep. at 44 (same); Wilcox Dep. at 29 (same); Tabor Dep. at 76 (only store manager or assistant manager could track sales).

**31.** Some department managers possessed keys to the register, and two deponents testi-

fied that they had access to the store's safe. Gill Dep. at 34; Carpenter Dep. at 54; Kurzawa Dep. at 53; Radillo Dep. at 28; Fleischer Dep. at 70; Keil Dep. at 36; Tabor Dep. at 53 (access to safe); Shapiro Dep. at 71 (access to safe).

**32.** Tabor Dep. at 53 (received keys to store as assistant manager); Keil Dep. at 53 (same).

than that of the class members as a whole, BB & B asserts that because of their shorter employment periods, the depositions taken do not fairly demonstrate the range of duties performed by department managers as they gained experience. However, the evidentiary record shows that the representative Plaintiffs had widely varying tenures, ranging from a few months to many years. The Court declines the invitation to undertake a mathematical analysis of the terms of employment of the representative Plaintiffs to compare to the terms of the other opt-in plaintiffs. The Court is satisfied that the range of periods of employment represented by the deponents is sufficient to allow a fair characterization of the job duties of BB & B department managers over time.

One procedural concern arises because of the additional duties front end managers carried out. While front end managers testify that their main duties were the same as those of the department managers, including stocking shelves and assisting customers, they also had additional duties related to the cash registers. These extra duties were training associates to use the cash registers, intialing certain transactions, counting money, opening registers, signing off on voided transactions, and carrying a key to the register or the safe.[33] At this point, the Court does not find that these additional duties force the conclusion that the front end managers are not similarly situated to the other department managers. At the very least, the front end managers appear to be similarly situated to one another. Therefore, if necessary to address this minor procedural concern, the Court might entertain a motion to create a sub-class of front end managers.

### Conclusion

In the present case, Plaintiffs allege violations of overtime provisions of the FLSA, and evidence shows commonalities supporting these allegations, including: (1) practice of making department managers salaried employees ineligible for overtime; (2) evidence showing that these employees worked more than forty hours per week; (3) evidence that these jobs largely included menial tasks. *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D.N.J.1987) (deciding to decertify class because of differing factual circumstances for class members, existence of individual defenses, and failure to satisfy filing requirements for numerous class members). In the present case, Plaintiffs have made substantial allegations, supported by evidence, that Defendant failed to comply with the FLSA by failing to pay overtime compensation to non-exempt employees on a class-wide basis. Since Plaintiffs are similarly situated, they should be afforded the opportunity to prove these claims collectively. Accordingly, Defendant's Motion To Decertify Putative Collective Action [170–1] is hereby **DENIED**.

---

**33.** *See, e.g.,* McNeil Dep. at 53 (front end manager trained cashiers); Gold Dep. at 59 (required to initial certain transactions); Shapiro Dep. at 70 (signed checks in excess of certain amount); Oriotis Dep. at 29 (counted money); Keil Dep. at 40 (same); Keil Dep. at 36 (front end manager helped cashiers and opened registers); McNeil Dep. at 57 (singed off on voids); Carpenter Dep. at 54 (key to register); Kurzawa Dep. at 53 (same); Radillo Dep. at 28 (same); Fleischer Dep. at 70 (same); Keil Dep. at 38 (same); Shapiro Dep. at 71 (key to safe). *But see* Tabor Dep. at 53 (only received keys to safe when promoted to assistant store manager); Keil Dep. at 36 (could not open safe as front end manager).